UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

GALLOP POWER GREENVILLE, LLC,   )
                                             )
        Plaintiff                )
                                             )
        v.                    )     Civil Action No. 1:15-cv-00032-JAW
                                             )
MOOSEHEAD SANITARY DISTRICT,     )
                                             )
        Defendant            )

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Gallop Power Greenville, LLC ("Gallop")[1] seeks partial summary judgment on

its complaint and summary judgment on the counterclaim of Defendant Moosehead Sanitary

District ("the District").  Gallop's motion raises two principal issues.  First, Gallop contends that

sewer rates assessed to its power plant in Greenville, Maine ("the Plant") are invalid because the

mathematical relationship between the Plant's average daily discharges and its payments shows

that the rates are not "uniform" under Maine law.  But the uniformity requirement does not apply

to the sewer rates paid by the Plant, and these rates are not subject to judicial review because

they were set by an agreement ("the Agreement") freely entered into by the Plant's owner.

Moreover, waiver and estoppel bars Gallop from challenging these rates.  Second, although

Gallop asserts that it terminated the Agreement, the Agreement is not terminable at will because

the Plant is located within the District and is legally compelled to remain connected to the

District's treatment system.  Thus, this Court should deny Gallop's motion.

---

[1] This memorandum will use the same defined terms employed by Gallop in its motion for partial
summary judgment and statement of material facts.

<u>Argument</u>

## I.    Judicial review of sewer rates

A pivotal factor in analyzing the validity of sewer rates is that sanitary districts cannot, as a practical matter, measure wastewater discharges. *Def.'s Statement of Additional Material Facts* ("DSAMF") ¶ 21.  Wastewater discharge meters, unlike water meters, inevitably clog because of the solid wastes discharged by a typical user. *Id.*  Accordingly, courts recognize that a precise mathematical relationship between wastewater discharges and sewer rates is not feasible.[2]  *See also id.* ¶ 32.  Inequities inevitably will occur in any sewer rate system.[3]

Because rate setting is an inexact science, courts accord sanitary districts considerable discretion in setting rates.[4]  Indeed, courts presume that sewer rates are valid.[5]  The user—in this case, Gallop—bears the burden of proving that its rates are unlawful.[6]

## II.    The Agreement is enforceable

Greenville Steam Company, the Plant's original owner, and the District entered into the Agreement on December 4, 1986.  *Local Rule 56(b) Stipulations* (ECF No. 23) ("*Stipulations*") ¶

---

[2] *See, e.g., Krupp v. Breckenridge San. Dist.,* 19 P.3d 687, 694 (Colo. 2001); *Andrews v. Town of New London*, 379 A.2d 441, 442 (N.H. 1977); *Reahl v. Randolph Tp. Mun. Util. Auth.*, 395 A.2d 241, 249 (N.J. Super. Ct. 1978); *cf. Kennebunk, Kennebunkport & Wells Water Dist. v. Town of Wells*, 147 A. 188, 190 (Me. 1929) ("Absolute uniformity in public service rates . . . is unattainable.  It can only be approximated.")

[3] *See, e.g., Phoenix Assoc., Inc. v. Edgewater Park Sewerage Auth.*, 428 A.2d 508, 513 & 514 (N.J. Super. Ct. 1981); *Boynton v. City of Lakeport Mun. Sewer Dist. No.1*, 28 Cal. App.3d  91, 96 (Cal. Ct. App. 1972); M. Brunner, Annotation, *Validity and Construction of Regulation by Municipal Corporation Fixing Sewer-Use Rates*, 61 A.L.R.3d 1236, § 3(d) (1975) ("Annot., 61 A.L.R.3d 1236").

[4] *See, e.g., Krupp*, 19 P.3d at 694; *Phoenix Assoc., Inc.*, 428 A.2d at 514; 12 E. McQuillin, THE LAW OF MUNICIPAL CORPORATIONS, § 35.56 at 828 (3d ed. 2006) ("12 McQuillin"); Annot., 61 A.L.R.3d 1236, § 3(e).

[5] *See, e.g., Boynton*, 28 Cal. App.3d at 95; 12 McQuillin, § 35.56 at 827; Annot., 61 A.L.R.3d 1236, § 3(e); *see generally Kennebunk, Kennebunkport & Wells Water Dist.*, 147 A. at 190 (water rates assumed to be uniform).

[6] *See, e.g., Brandywine Homes v. Caln Tp. Mun. Auth.*, 339 A.2d 145, 148-49 (Pa. Commw. Ct. 1975) (burden of showing abuse of discretion by sewer authority is "a heavy one"); 12 McQuillin, § 35.56 at 827 & 832-33; Annot., 61 A.L.R.3d 1236, § 3(e); 56 Am.Jur.2d *Municipal Corporations* § 528 (2000).

16.  The Agreement is a detailed and comprehensive contract governing the discharge of industrial wastewater by the Plant to the District.  *Id.* ¶ 16  & Exh. A (ECF No. 23-1).  This contract obligates the District to accept discharges up to 20,000 gallons per day ("GPD") from the Plant and sets the fees to be paid by the Plant in the attached rate schedule ("the Plant Rate Schedule").  *Id.* ¶ 17.

Greenville Steam freely entered into the Agreement.[7]  Before the execution of the Agreement, the Plant was not located within the District and therefore did not have to connect to the District's wastewater treatment system ("the System").  The District's Sewer Use Ordinance forces property owners to hook up to the System only if their buildings are "accessible" to a sewer or drain of the District.  DSAMF ¶ 14.  A building is deemed to be accessible if it is located within 200 feet of a District sewer <u>or</u> if a private sewer directly or indirectly connected to the building or carrying industrial waste from the building comes within 200 feet of a District sewer.  *Id.*; *see* 38 M.R.S. § 1160.  When Greenville Steam submitted its industrial sewer connection application to the District in August 1986, the Plant's buildings did not fall into either category.  *Statement of Material Facts in Support of Pl.'s Mot. for Partial Summ. J.* ("PSMF") ¶ 24; DSAMF ¶ 16.  Thus, Greenville Steam did not have to tie into the System and could explore other options to dispose of its industrial wastewater, including obtaining a permit to process the wastewater on the Plant property.  DSAMF ¶¶ 8 & 20.

The fact that the Sewer Use Ordinance did not compel Greenville Steam to connect to the System in 1986 is critical in analyzing Gallop's motion for partial summary judgment.  When the parties negotiated the Agreement, not only did Greenville Steam not have to hook up, but the

---

[7] And Gallop freely assumed Greenville Steam's obligations under the Agreement when Gallop bought the Plant in 2009.  *Stipulations* ¶ 26.

3

District had no obligation to provide wastewater treatment services to the Plant.[8]  This meant that the parties were free to contract with each other in any manner they chose, or, indeed, not to contract at all.  Greenville Steam and the District opted to engage in extensive negotiations concerning the discharge of the Plant's industrial wastewater into the System.  *Id.* ¶¶ 1-13.  The parties were represented by attorneys during the contract talks.  *Id.* ¶¶ 10 & 11.  These negotiations culminated in the Agreement.

Because both parties freely entered into the Agreement, it must be construed and enforced using ordinary principles of contract law.[9]  The most critical principle is that a contract be interpreted according to the intent of the parties as disclosed by its language, the subject matter, and the surrounding circumstances.[10]  The Agreement unambiguously obligates Gallop to pay the fees in the Plant Rate Schedule in exchange for the District's pledge to accept discharges of up to 20,000 gallons per day ("GPD") from the Plant.  *Stipulations* ¶ 17.  The fact that the Agreement deals with wastewater discharges and sewer rates is of no import.  The Maine Legislature has authorized sanitary districts to enter into such contracts.[11]  In addition, courts routinely enforce sewer contracts with extraterritorial users according to the agreed-upon terms.[12]

---

[8] *See, e.g., Payson San. Dist. of Gila Cty. v. Zimmerman*, 581 P.2d 1148, 1151 (Ariz. Ct. App. 1978) (no obligation to provide service outside boundaries); 11 E. McQuillin, THE LAW OF MUNICIPAL CORPORATIONS, §31.30 at 256 (3d ed. 2000) ("11 McQuillin") ("the use of a common sewer is a matter for decision by the property owner" if not required to connect); S. Stevenson, ANITEAU ON LOCAL GOVERNMENT LAW, § 83.04(3) at 83-29 (2d ed. 2008) ("Aniteau") (generally "no obligation to provide service to those outside the district[ ]").

[9]  This diversity action is governed by Maine law.

[10] "In interpreting a contract, the court is guided primarily by the intent of the parties as revealed in the contract language and viewed in the circumstances surrounding the contract."  Maine Civil Remedies, § 10-4(a) at 223 (4th ed. 2004); *see Hodgkins v. New Eng. Tel. Co.,* 82 F.3d 1226, 1230 (1st Cir. 1996); *Foster v. Foster*, 609 A.2d 1171, 1172 (Me. 1992); *Baybutt Constr. Corp. v. Comm. Union Ins. Co.*, 455 A.2d 914, 919 (Me. 1983).

[11]  *See* 38 M.R.S. § 1157.

[12] *See, e.g., Schlarb v. No. Suburban San. Dist.*, 357 P.2d 647, 648 (Colo. 1960); *Copper Country Mobile Home Park v. City of Globe*, 641 P.2d 243, 247 (Ariz. Ct. App. 1981); 11 E. McQuillin, § 31.30.10 at 264-65; 12 McQuillin, § 35.68 at 865; Aniteau, § 83.04(3) at 83-26 (sewer contracts interpreted by usual

This is because the relationship of a sanitary district to users "beyond its limits arises only through contract and the reasonableness or unreasonableness of its charges for access to its system is not subject to judicial review."[13]  This principle applies to the Agreement.

Yet Gallop attempts to portray Greenville Steam as a "supplicant[]" with "no choice but to accept what was . . . a completely arbitrary rate structure, proposed by a monopoly, if it wanted its project to progress."  *Pl.'s Mot. for Partial Summ. J.* (ECF No. 26) ("*Pl.'s Mot.*") at 27 n.25.  This portrait is at odds with the facts.  First, Greenville Steam did have a choice because the Sewer Use Ordinance did not require it to hook up to the System and it had other options for handling the industrial wastewater.  DSAMF ¶¶ 8 & 20.  Second, the documentary record of the negotiations that led to the Agreement reveals back-and-forth bargaining between parties represented by attorneys, not a monopoly provider dictating sewer rates.  *Id.* ¶¶ 2-13. Third, even assuming for the sake of argument that the record did support Gallop's claim that the District forced Greenville Steam to pay arbitrary rates, Gallop willingly assumed this contractual obligation when it purchased not only the Plant but also Greenville Steam's title and interest in the Agreement.  *Stipulations* ¶ 26.  Gallop cannot now protest that neither it nor Greenville Steam had a choice.

Gallop also tries to undercut the plain meaning of the Agreement by asserting that the District cannot explain how the parties set the rates in the Plant Rate Schedule.  *Pl.'s Mot.* at 17-18.  But the Agreement is enforceable according to its terms regardless of what occurred during negotiations, why either party decided to enter into the Agreement, or whether anyone can recall

---

principles of contract law); *see generally City of Racine v. Town of Mt. Pleasant*, 213 N.W.2d 60, 63-64 (Wis. 1973).

[13] *Payson San. Dist*, 581 P.2d at 1151; *see Fairway Manor, Inc. v. Bd. of Commrs. of Summit Cty.*, 521 N.E.2d 818, 820-22 (Ohio 1988) (contract for extraterritorial water rates not subject to review); *Schlarb*, 357 P.2d. at 648 (relationship was "purely contractual" and reasonableness of terms therefore not subject to judicial review).

why the parties agreed to the Plant Rate Schedule.  Moreover, Gallop incorrectly asserts that the District cannot offer a rationale for the Plant Rate Schedule.

Although no living person can recall the negotiations conducted three decades ago, an extensive documentary record exists.  DSAMF ¶ 1.  Greenville Steam and the District exchanged detailed information concerning the quantity and quality of the Plant's industrial wastewater discharges and the effect those discharges would have on the System.  *Id.* ¶¶ 2-9 & 13.  For example, Greenville Steam informed the District that the Plant may need to discharge as much as 29,400 GPD to the System.  *Id.* ¶ 2.  Greenville Steam subsequently assured the District that it would never exceed 20,000 GPD.  *Id.* ¶ 8.  In addition, the District expressed a number of concerns about the quantity and quality of the Plant's proposed discharges.  *Stipulations* ¶ 12. These concerns included the following:

- that the District needed reliable data from Greenville Steam given that the District was responsible for serving several communities and had to retain some additional capacity for expansion in other areas, DSAMF ¶ 5;
- that the District would be operating at 89% of capacity if the Plant discharged 20,000 GPD, leaving little room for future expansion, *id.*;
- that Greenville Steam had not provided vital information to the District about the character of the proposed discharge, which was critical because the treatment method was biological and likely to be affected by adverse effluent characteristics, *id.* ¶ 6; and
- that the District needed to be able to monitor discharges to determine average and peak flows and effluent characteristics, *id.* ¶ 7.

The parties also discussed several proposed rate schedules.  PSMF ¶ 1.

The quantity and quality concerns discussed during contract negotiations present a clear rationale for the terms of the Agreement, including the rates charged to Greenville Steam.  As noted above, sanitary districts cannot, as a practical matter, meter discharges because solid wastes clog meters.  As a result, districts base their rates on factors such as those outlined above. These factors justify the rates in the Plant Rate Schedule.  DSAMF ¶¶ 30 & 31.

Gallop further argues that the Plant Rate Schedule fails to meet the mandate of 38 M.R.S. § 1202 that sewer rates "be uniform within such district."  This limitation, however, does not apply to the Plant Rate Schedule because these rates were not set pursuant to the District's police power given that the Plant was located outside the District.[14]  Section 1202 authorizes a sanitary district to fix sewer rates for users within the district.  38 M.R.S. § 1202 (1st ¶).  The District can exercise this police power only after it holds a public rate hearing, publishes the proposed rates prior to the hearing, and mails to each ratepayer a notice of the public hearing and the proposed rates.  *Id.* (3rd ¶).  The uniformity standard protects users whose property is accessible to a sanitary district because they have no option other than to pay rates imposed on them under a district's police power.[15]  Uniformity is required because users within a sanitary district are a captive group that "have no alternative but to connect their sewers to the . . . system.  They cannot negotiate contractually on terms, conditions, or the like."[16]

But the uniformity requirement does not apply to sewer rates paid by property owners outside a sanitary district because they are not compelled to hook up and are able to freely negotiate contract terms if they choose to connect.[17]  Before voluntarily entering into the Agreement, Greenville Steam fell into this category.  Uniformity does not pertain to the Agreement because the District did not unilaterally impose the Plant Rate Schedule pursuant to

---

[14] Police power refers to the "power of the state and its legal subdivisions to impose such restraints upon private rights as are necessary for the general welfare."  6A E. McQuillin, THE LAW OF MUNICIPAL CORPORATIONS, §24:2 at 13-14 (3d ed. 2015).

[15] *See Mun. Auth. of the City of Monongahela v. Carroll Tp. Auth.*, 555 A.2d 264, 268-69 (Pa. Commw. Ct. 1989); *Middlesex Cty. Sewerage Auth. v. Boro. of Middlesex*, 181 A.2d 818, 825 (N.J. Super. Ct. 1962).

[16] *Middlesex Cty. Sewerage Auth.*, 181 A.2d at 825.

[17] *See Mun. Auth. of the City of Monongahela*, 555 A.2d at 268-69; *Middlesex Cty. Sewerage Auth.*, 181 A.2d  at 824-25; *Davisworth v. City of Lexington*, 224 S.W.2d 649, 651-52 (Ky. Ct. App. 1949).

its police powers.  These rates instead are the product of a bargained agreement between parties not compelled to contract with each other.

Gallop contends that the Agreement incorporates the uniformity requirement into the Plant Rate Schedule and that the District therefore had to comply with section 1202 even if it would not otherwise have to do so when dealing with an extraterritorial user.  But the plain meaning of the Agreement refutes this contention.  The last sentence of section I provides that "[s]aid [Plant] Rate Schedule will be amended from time to time by [the District] and shall be binding upon [Greenville Steam] subject to the terms of 38 M.R.S.A. Sec. 1202."  *Stipulations* ¶ 17.  That is, if the District amends the Plant Rate Schedule, the new rates must satisfy the statutory uniformity requirement.  The District, however, has never amended the Plant Rate Schedule:  the Plant is still assigned 210 user units, and the rates for discharges exceeding 12,000 GPD remain unchanged despite the passage of three decades.[18]  DSAMF ¶ 28.  Accordingly, the last sentence of section I of the Agreement has not been triggered and does not apply to this case.

The contract negotiations between the parties confirm this interpretation of the Agreement.  These negotiations reveal an intent to invoke section 1202 only for amendments to the Plant Rate Schedule.  Angus King, counsel for the Plant's developer, requested a revision in the draft agreement to ensure that any future rate changes in the Plant Rate Schedule would apply to other users as well.  *Id.*  ¶¶ 10 & 11.  This request ultimately led to the language referring to section 1202.  *Id.* ¶ 12.  This history confirms that the unambiguous language of section I of the Agreement applies the uniformity requirement to the contractual sewer rates in the Plant Rate

---

[18] The Plant's fees have risen over time because the per user unit fee has increased for all District customers.  DSAMF ¶ 29; PSMF ¶ 13.  Because the District applied all such increases across the board, they do not constitute an amendment to the Plant Rate Schedule or implicate section 1202.

Schedule only if the District amends these rates or fails to implement a corresponding per unit rate increase for its other users.

## III.   The Plant Rate Schedule is uniform

Even assuming for purposes of argument that section 1202's uniformity standard applies to the Plant Rate Schedule, Gallop has not met its burden of proving as a matter of law that the rates Greenville Steam promised to pay—and that Gallop willingly assumed—fail to comply with the statute.  Uniformity, which is common throughout the United States, mandates only that a sanitary district's rates not be unreasonable, arbitrary, or discriminatory.  Moreover, Gallop incorrectly focuses its uniformity analysis on the purported mathematical relationship between the Plant's average daily discharges and the district-wide percentage of fees paid by the Plant. Gallop disregards other, more pertinent, factors demonstrating the uniformity of the Plant Rate Schedule.

### A.  Uniformity requires that rates not be unreasonable, arbitrary, or discriminatory

The statutory requirement that rates be uniform within a sanitary district would appear, at first blush, to require that a district charge all customers in an identical manner, *i.e.*, on a per gallon basis with each gallon discharged billed at the same rate.  But the case law universally rejects such a rigid interpretation.  Because sanitary districts cannot meter wastewater discharges, courts hold that uniformity does not demand either a precise mathematical relationship or absolute uniformity.[19]  Sewer rates are uniform if they are not unreasonable, arbitrary, or discriminatory.[20]

Although the Law Court has not construed section 1202, it has interpreted identical language governing water rates to mean that uniformity does not call for mathematical precision.

---

[19] *See supra,* at 2 n.2.
[20] *See, e.g.,* 11 McQuillin, § 31.30.15 at 270-71 and cases cited therein.

In *Kennebunk, Kennebunkport & Wells Water Dist. v. Town of Wells*,[21] the Town of Wells disputed water hydrant rentals nearly double the rate paid by another town. Wells contended that the water district should have divided the total hydrant rent in the district's towns by the number of hydrants and charged each town the same rate per hydrant. The Law Court rejected this mathematical equation, stressing that uniformity demands only that rates be reasonable and not unjustly discriminatory.[22] The Court explained that "[a]bsolute uniformity in public service rates, like uniformity in taxation, is the unattainable. It can only be approximated."[23]

The case law makes clear that there is no right or wrong way to set sewer rates. Indeed, a myriad of rate structures exist.[24] Sanitary districts must, of necessity, fix rates using a variety of imprecise and sometimes inconsistent factors.[25] For example, districts may charge some users a flat rate but bill others based on metered water consumption without violating the uniformity requirement.[26] Similarly, sanitary districts may treat apartments and single-family residences as either the same class of service or as two different classes.[27] And although many courts approve sewer rates based on the amount of water flowing into a property, others nix this method.[28] "It is improbable, if not impossible, that any classification or rate basis could be devised which would not in some way discriminate against some of the users of the sewer system."[29]

---

[21] 147 A. 188 (Me. 1929).
[22] *Id.* at 190.
[23] *Id.*
[24] *See, e.g., Merrimac Paper Co. v. City of Lawrence*, 1995 WL 1286562 at *5 & *7 (Mass. Super. Ct. Aug. 29, 1995).
[25] 11 McQuillin, § 31.30.15 at 274-75; 12 McQuillin, § 35.56 at 835.
[26] *See, e.g., Antlers Hotel, Inc. v. City of Newcastle*, 341 P.2d 951, 955-56 (Wyo. 1959); *Glenn Riddle Park, Inc. v. Middleton Tp.*, 314 A.2d 524, 527 (Pa. Commw. Ct. 1974); Aniteau, § 83.04(6) at 83-44.
[27] *See New Providence Apts. Co. v. Boro. of New Providence*, 31 A.3d 958, 962 (N.J. Super. Ct. 2011).
[28] *See, e.g., Concord Steam Corp. v. City of Concord*, 519 A.2d 266 (N.H. 1986) (water usage rejected).
[29] Annot., 61 A.L.R.3d 1236, § 2(a) at 1241.

**B. Gallop disregards the factors establishing that the Plant Rate Schedule is not unreasonable, arbitrary, or discriminatory**

After first paying lip service to the principle that uniformity does not require mathematical precision, Gallop attacks the Plant Rate Schedule on the ground that there is no mathematical relationship between the Plant's average GPD discharges and the percentage of district-wide fees paid by the Plant.[30]  As the Law Court stressed in *Kennebunk, Kennebunkport & Wells Water Dist.,* where it spurned a comparably misleading mathematical equation, "[r]ate-making is not so simple a problem."[31]  Average GPD discharges do not accurately reflect the Plant's actual use of, and impact on, the System or the value of the District's services to the Plant.  As the District will demonstrate below, the Plant Rate Schedule is not unreasonable, arbitrary, or discriminatory because this schedule relies on legitimate factors such as the amount of capacity allocated to the Plant, the Plant's peak discharges, the capacity remaining available in the System for other users and future expansion, the quality of the Plant's discharges, and the Plant's unique status as the System's only industrial user.  DSAMF ¶ 31.

**1. The Agreement reserves 20,000 GPD of capacity to the Plant**

The District's general rate schedule ("the General Rate Schedule"), which applies to all users except the Plant, is a flat-fee system that allots one or more user units to each user and imposes a district-wide per unit fee.  *Stipulations* ¶ 8.  The General Rate Schedule assigns user units based on property use and the amount of capacity allocated to that type of use, not on the volume of wastewater actually discharged by individual users.  DSAMF ¶ 26.  For example, the schedule assigns one user unit to a single-family residence regardless of the size of the home, the

---

[30] Gallop quotes from depositions several times in its memorandum.  This testimony should be ignored to the extent it goes beyond the facts in the stipulations and Gallop's statement of material facts.
[31] 147 A. at 190.

number of bathrooms, the number of occupants, and whether the residence is occupied year-round or seasonally. *Id.* ¶ 27.

Like the General Rate Schedule, the Plant Rate Schedule rests on the amount of capacity allocated to the use in question, not actual volume. The Agreement contractually binds the District to accept 20,000 GPD from the Plant. *Stipulations* ¶ 17. The District therefore reserved 20,000 GPD of the System's limited capacity for the Plant's exclusive use. DSAMF ¶ 33. The District cannot allocate any portion of this volume to existing or new customers. *Id.* ¶ 35. Thus, the Plant in effect bought 20,000 GPD of capacity from the District. *Id.* ¶ 36. Charging the Plant for this purchased capacity is not unreasonable, arbitrary, or discriminatory.[32] *Id.* ¶¶ 36 & 41.

Although the uniformity standard eschews mathematical precision, an analysis of the mathematical relationship between the user units allotted to the Plant and those allotted to a single-family residence is instructive. The General Rate Schedule assigns one user unit to a home. *Stipulations* ¶ 8 & Exh. B (ECF No. 23-2). Median water usage in Greenville, Maine for a single-family residence is 82 GPD in the winter. DSAMF ¶ 38. This usage, at a time of year when outdoor water uses are rare, correlates to the amount of wastewater discharged to the System. *Id.* ¶ 39. Because one user unit for a home equates to discharges of 82 GPD, the 20,000 GPD allocated to the Plant equals almost 244 user units, nearly 34 units more than the 210 user units assigned by the Plant Rate Schedule. *Id.* ¶ 40. Thus, the Plant's 210 user units generate fees lower on a per gallon basis than those paid by homeowners. This calculation further corroborates that when the capacity reserved to the Plant is considered, the Plant Rate Schedule complies with section 1202.

---

[32] Gallop notes that the Plant's discharges only minimally increased the District's pumping and chemical costs. Although the incremental costs relating to the Plant are minimal, the general operating, maintenance, and overhead costs of the System must be shared by all users, including the Plant.

### 2. The Plant's peak discharges dwarf the average GPD discharge

Gallop's reliance on the average GPD discharge ignores the fact that the Agreement reserves 20,000 GPD of capacity for the Plant.  Whether the Plant actually uses this capacity is of no matter.  *Id.* ¶ 37.  Besides, the average GPD discharge artfully understates the Plant's actual use of the System because it masks the Plant's peak discharges.  These discharges are an important factor in fixing sewer rates because the System needs to have the capacity to handle peak flows.  *Id.* ¶ 52.  Although the Plant's releases on some days undoubtedly fall below the average GPD discharge shown in Tables 2 and 3 of Gallop's memorandum,[33] the Plant actually uses—and, more importantly, needs—significantly more capacity than the daily average to operate.  The Plant's operations require periodic and unpredictable peak discharges that greatly exceed the typical volume.  *Id.* ¶¶ 50 & 51.  Thus, the Plant needs much more of the System's resources than average GPD flows would indicate.

The Plant's daily operating logs reveal its need for the capacity allocated by the Agreement.  When the Plant operated, it discharged over 20,000 gallons into the System on 12 days despite Greenville Steam's promise that it would never exceed this volume.  *Id.* ¶¶ 8 & 44-46.  In fact, the flow surpassed 30,000 gallons one day, and another day it came close to that figure.  *Id.* ¶¶ 48 & 49.  The Plant also discharged between 12,000 and 19,999 gallons on more than 115 days.  *Id.* ¶ 47.

These peak discharges demonstrate why Greenville Steam requested that the Agreement reserve 20,000 GPD for the Plant.  Without this capacity, the Plant could not function because it could not discharge its peak flows to the System.  Indeed, the Plant could not even fire up its

---

[33] As explained below, the daily average calculated by Gallop in these tables is inaccurate.  *See infra,* at  .

boiler.  *Id.* ¶ 50.  Thus, the value of the District's services to the Plant greatly exceeds the rates in the Plant Rate Schedule.  This value provides a rational basis for these rates.[34]

Gallop's contention that uniformity dictates that its rates be calculated using a mere 1,114 GPD does not conform to reality.  As evidenced by the more than 127 days that the Plant discharged in excess of 12,000 gallons, the Plant could not have generated electricity even if it was allocated ten times the average GPD in Gallop's tables.  This explains why Gallop and Greenville Steam never requested that the District reduce the 20,000 GPD reserved capacity or the rates in the Plant Rate Schedule.  *Id.* ¶¶ 79 & 80.  The Plant Rate Schedule properly bases rates on peak discharges because the Agreement set aside for the Plant's exclusive use the capacity needed to accommodate those discharges.  *Id.* ¶¶ 33, 52, & 53.

Because average GPD discharges do not reflect the Plant's actual use of the System, Tables 2 and 3 are not germane.  But even though this average has no bearing on the propriety of the Plant Rate Schedule, the District notes that Gallop's tables are not even an accurate depiction of daily discharges.  First, the seven years depicted in these tables include 2012 and 2015, when the Plant did not operate.  *Stipulations* ¶ 29.  Second, the tables take into account 1997 and 2002, two of the lowest years in the Plant's operating history.  DSAMF ¶ 42.  These atypical four years skew Gallop's calculations because they make up nearly 60% of the years used by Gallop to calculate average GPD.  Third, the Plant operated for only 45 weeks a year, *id.* ¶ 43, but Gallop's tables use every day of the year to calculate the daily averages, not just operating days.  *Stipulations* ¶ 43 & Exh. H (3rd & 4th columns).  Accordingly, Gallop's claimed average of 1,114 GPD substantially underestimates the Plant's average discharges and should be disregarded.[35]

---

[34] *See Hickory Tp. v. Brockway*, 192 A.2d 231, 233 (Pa. Super. Ct. 1963) (sewer charge must be reasonably proportional to value of service, not to use of system; rate for motel double that of residential users upheld).
[35] Table 4 suffers from the same defects as Tables 2 and 3.

### 3. The allocation of 20,000 GPD to the Plant used up most of the System's remaining capacity

The Agreement allocated to the Plant 20,000 GPD of the 136,000 GPD of useable capacity in the System.  DSAMF ¶¶ 57 & 58.  This allocation increased the use of the System's capacity to nearly 90%.  *Id.* ¶ 54; *Stipulations* ¶ 15.  This is significant for two reasons.  First, when a Maine sanitary district's allocations approach 90% of capacity, this raises the specter of an order by the Maine Department of Environmental Protection directing the District to pay for an expensive upgrade, expansion, or replacement of the System due to the limited remaining capacity.  DSAMF ¶ 56.  Second, the District has an obligation to maintain the System to maximize the potential use for all existing or future users.[36]  *Id.* ¶ 55.  But the 20,000 GPD allocation to the Plant left little room for adding new users or for allowing current users to expand their use.  These considerations demonstrate that the Plant Rate Schedule is not unreasonable, arbitrary, or discriminatory.[37]  *Id.* ¶ 59.

### 4. The Plant's discharges are qualitatively different from those of other users

The quality of the Plant's discharges are also a factor in evaluating the Plant Rate Schedule.  During the contract negotiations in 1986, the District expressed concerns about the nature and quality of the Plant's discharges.  *Id.* ¶¶ 3, 6, 9, & 13.  These discharges are nutrient deficient because they lack microbes.  *Id.* ¶ 60.  As such, they could dilute and even kill the microbiology essential for the System to operate properly.  *Id.*  The presence of algaecide in the Plant's discharges magnifies this threat.  *Id.* ¶ 61.  And because the System is an indirect discharge system, the District cannot buffer the discharges.  *Id.*  Although the Plant's discharges

---

[36] *See Boynton*, 28 Cal. App.3d at 96 (sewer system must be maintained to accommodate potential maximum use).

[37] *See Vermont No. Props. v. Village of Derby Center*, 102 A.3d 1084, 1091 (Vt. 2014) (30% surcharge on large users justified because of limited capacity).

do not require special treatment, the District's concerns about the quality of the Plant's flows justify the rates charged, especially in light of the District's obligation to maintain the System to maximize the potential use for all users.  *Id.* ¶ 62.  These concerns demonstrate that the Plant Rate Schedule is not unreasonable, arbitrary, or discriminatory.  *Id.* ¶ 63.

### 5.  The Plant is in a class of its own

Compared to other users of the System, the Plant is *sui generis*.  Its discharges are quantitatively and qualitatively different from those of the District's residential and small business users.  *Id.* ¶ 67.  The Plant is by far the largest user:  the 210 user units allotted to it exceed by more than 165 units the number of units assigned to the next largest user.  *Id.* ¶ 66.  In addition, as the sole source of industrial wastewater in the District, the Plant does not fall within any user category in the General Rate Schedule, which has no industrial classifications.  *Id.* ¶ 65; *Stipulations* ¶¶ 8 & 14 and Exh. B (ECF No. 23-2).  Indeed, the Sewer Use Ordinance recognizes that industrial users make up a class of their own, separate and distinct from the residential and commercial property owners covered by the General Rate Schedule.  DSAMF ¶ 64.

A sanitary district has the discretion to group users into different classifications for sewer charges.[38]  Such classifications do not contravene the uniformity requirement if they are rational and if the District treats everyone in a class alike.[39]  For example, a sanitary district may differentiate between commercial and residential properties or between different types of commercial properties.[40]  "Not every discrimination is condemned but only a discrimination

---

[38] *See, e.g.,* 11 McQuillin, § 31.30.20 at 276-77; 12 McQuillin, § 35.55 at 807 & § 35.57 at 837-38; Aniteau, § 83.04(6) at 83-43 to -44.

[39] *See, e.g., id.*; *Rezek v. Village of Richmondville*, 806 N.Y.S.2d 772 (N.Y. App. Div. 2005) (all properties with multiple businesses treated the same); *Andrews v. Town of London*, 379 A.2d 441, 442 (N.H. 1977) (all residential users treated the same; lack of mathematical equality does not render rates invalid).

[40] *See, e.g., Antlers Hotel, Inc. v. City of Newcastle*, 341 P.2d 951, 956 (Wyo. 1959); 11 McQuillin, § 31.30.20 at 276-77; *see generally* 12 McQuillin, § 35.57 at 837 (to be unlawful, "discrimination must

16

which is arbitrary, in view of the fact that it is impossible to measure the justness of a rate upon a mathematical basis."[41]

Here, the District rationally treated the Plant as falling outside the General Rate Schedule. As the only industrial user, Gallop cannot claim that its rates unfairly diverge from those paid by a residential or commercial user.  To the extent any differences exist, the District has a rational basis for placing the Plant in a separate category.  The fact that the Plant is in a class of its own shows that the Plant Rate Schedule is not unreasonable, arbitrary, or discriminatory.  *Id.* ¶ 68.

**C.  The District's user unit rate structure does not violate the uniformity standard**

Gallop asserts that the General Rate Schedule runs afoul of the uniformity limitation because of the absence of a relationship between the assignment of user units and the volume of effluent actually discharged into the System.  *Pl.'s Mot.* at 23-25.  According to Gallop, user unit rate structures are arbitrary unless districts attribute a specific discharge volume to one user unit and then assign units to each user based on its expected volume.  In other words, Gallop argues yet again that sewer rates are improper unless a mathematical relationship exists between the rates charged to all customers.

Gallop fails to explain how its theory that the General Rate Schedule is invalid entitles it to summary judgment or why it even has standing to challenge this schedule.  The issue before this Court is the legitimacy of the Plant Rate Schedule, not the lawfulness of the General Rate Schedule.  Moreover, in its attack on the General Rate Schedule, Gallop misstates the nature of the District's user unit rate structure and the fact that it is an appropriate method for setting sewer rates.

---

draw an unfair line or strike an unfair balance between those in like circumstances having equal rights and privileges")
[41] *Antlers Hotel*, 341 P.2d at 955; *see Phoenix Assoc., Inc.*, 428 A.2d at 514; *Hickory Tp.*, 192 A.2d at 232-34.

A flat-fee rate structure employing user units does not rest on actual GPD discharges.[42] DSAMF ¶ 22.  A user unit system classifies properties by their use and the volume allocated to that type of use, not by how much effluent a property owner actually discharges.  *Id.* ¶¶ 25 & 26. Even though users in the same class may discharge widely varying volumes, setting rates based on property use and the amount of capacity allocated for that type of use is an accepted and valid method.  *Id.* ¶¶ 25 & 27.  This is particularly true in rural areas, like Greenville, where sanitary districts cannot track water usage.  *Id.* ¶ 23.  Thus, the District's adoption of a flat-fee rate structure was necessary and appropriate.  *Id.* ¶ 24.  In the opinion of the District's expert, this schedule is uniform and not unreasonable, arbitrary, or discriminatory.  *Id.* ¶ 30.

In support of its argument that the District's user unit rate structure is arbitrary, Gallop cites *Ridgway Tp. Mun. Auth. v. Exotic Metals, Inc.*[43]  *Ridgway* dealt with water rates, which, unlike sewer discharges, can be metered.  The water district in *Ridgway* assigned 50 units to the defendant for billing purposes, but the trial court found that the defendant's actual water usage amounted to only 12 ½ units.[44]  Not surprisingly, the court invalidated the assignment of 50 units given the defendant's actual use.  This holding is not germane to this case because we are concerned here with the uniformity of rates for unmetered sewer discharges.  Unlike *Ridgway,* the General Rate Schedule allots user units based on the capacity allocated for particular property uses, not an individual user's actual use.

---

[42] Flat-fee rates unrelated to the amount of sewer use are valid.  *See Chicora Commons Ltd. Partnership v. Chicora Boro. Sewer Auth.*, 922 A.2d 986, 994 (Pa. Commw. Ct. 2007) (rates based on 27 units upheld even though plaintiff consumed only 4-10 units); Annot., 61 A.L.R.3d 1236, § 4(b) at 1265 & nn.15 & 18.

[43] 491 A.2d 311 (Pa. Commw. Ct. 1985).

[44] *Id.* at 313.

18

**D. *Concord Steam* is not analogous to this case**

Gallop relies heavily on *Concord Steam Corp. v. City of Concord* [45] to support its uniformity argument, but this decision involves issues far removed from those presented here.  In *Concord Steam*, the city calculated sewer rates (other than in special circumstances) based on the volume of water delivered to a property.  The plaintiff argued that this method of calculating its sewer rates was unreasonable.  The plaintiff demonstrated that it discharged as wastewater only a small percentage of the water purchased because it used nearly all of this water to produce steam sold to the plaintiff's customers.  Relying on a municipal ordinance and a statute excepting industrial uses from sewer rates based on water usage, the New Hampshire Supreme Court held that the rates charged to the plaintiff were unreasonable. [46]

Contrary to Gallop's suggestion, *Concord Steam* is not analogous to this case.  Unlike the City of Concord, the District does not, and cannot, base its sewer rates on water consumption.  In addition, the municipal ordinance and New Hampshire statute referred to above played a critical role in the court's decision.  No similar ordinances or statutes apply here.  Moreover, the facts in *Concord Steam* are not even remotely similar to those in this case:  the District uses an entirely different method for setting sewer rates, and the Plant is not in any way similar to a steam production facility.  Unlike the situation in *Concord Steam*, the rates that the Plant agreed to pay to the District bear a strong relationship to the factors on which the Plant Rate Schedule rests.

**V.  Waiver and estoppel bar the complaint**

Gallop contends that the doctrines of waiver and estoppel do not bar it from pursuing the complaint.  *Pl.'s Mot.* at 27-28.  But the facts in the summary judgment record, including the performance of Greenville Steam and Gallop under the Agreement for nearly three decades

---

[45] 519 A.2d 266 (N.H. 1986).
[46] *Id.* at 269-70.

without protest, establish waiver and estoppel or, at the very least, raise genuine issues of material fact.

The elements of waiver and estoppel are well established in Maine law.  Waiver is a "voluntary or intentional relinquishment of a known right and may be inferred from the acts of the waiving party."[47]  The conduct constituting waiver must induce a belief that the waiving party intended to abandon its rights.[48]  Estoppel, although similar to waiver, "focuses on misleading conduct rather than intention."[49]  If a party relies on misleading conduct to its detriment, estoppel precludes the opposing party from asserting a right it may otherwise have.[50]

Greenville Steam freely entered into the Agreement,[51] hooked up to the System, and performed its obligations under the Agreement for 23 years.  In 2009, Gallop purchased the Plant, willingly assumed Greenville Steam's interest in the Agreement, and performed its contractual obligations until attempting to terminate the Agreement.  Prior to the professed notice of termination, neither Greenville Steam nor Gallop had informed the District that their sewer payments were made under protest.  DSAMF ¶ 83.  In addition, Greenville Steam and Gallop never sought a reduction of the rates in the Plant Rate Schedule or the 20,000 GPD of capacity allocated to the Plant, nor did they ask for a refund of previous payments.  *Id.* ¶¶ 79 & 80.  They also did not request that the District assign a vacant property rate or readiness-to-serve charge to the Plant.  *Id.* ¶ 81.  Indeed, after the Plant suspended operations, the District asked Gallop about its intentions, but Gallop never responded.  *Id.* ¶¶ 77 & 78.  Although Gallop complains that the

---

[47] *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 26, 980 A.2d 1270, 1277 (internal quotation marks omitted); *see Chalet Susse Intl., Inc. v. Mobil Oil Corp.,* 597 A.2d 1350, 1352 (Me. 1991).
[48] *Blue Star,* 2009 ME 101, ¶ 26, 980 A.2d at 1277.
[49] *Chalet Susse*, 597 A.2d at 1353; *see OfficeMax, Inc. v. Sousa*, 773 F.Supp.2d 190, 236 (D. Me. 2011).
[50] *Blue Star,* 2009 ME 101, ¶ 27, 980 A.2d at 1277.
[51] Gallop claims that waiver and estoppel do not apply because Greenville Steam had no choice but to enter into the Agreement.  *Pl.'s Mot.* at 27 n.25.  This does not accord with the facts.  *See supra*, at 5.

Plant Rate Schedule violated the uniformity requirement from the inception of the Agreement, *id*. ¶ 76, the Plant's owners did nothing to pursue their alleged rights until this action.

These facts establish waiver and estoppel.  Neither Greenville Steam nor Gallop notified the District that they believed anything was amiss until December 2013.  *Id.* ¶¶ 83 & 84. Instead, they continued to perform under the Agreement without protest.  This constitutes both an abandonment of known rights and misleading conduct, thereby justifying a finding of waiver and estoppel.[52]  The District relied to its detriment on this conduct in setting its budgets and incurring operational and maintenance costs.  *Id.* ¶¶ 85-87.  Moreover, because Gallop intends to seek 20 years of refunds, *Pl.'s Mot.* at 11 n.14, permitting Gallop to proceed with its complaint would work a severe financial hardship on the District, which cannot undo its budgets and operational and maintenance decisions years after the fact.  DSAMF ¶ 88.

Gallop attempts to sidestep the bar of waiver and estoppel by contending that it cannot waive rights under section 1202 because the statute embodies a legislative determination to protect the public from improper sewer rates.  But parties can waive statutory rights, and even fundamental constitutional rights.[53]  The United States Supreme Court has stressed that a presumption exists that legal rights are subject to waiver.[54]

Gallop nevertheless tries to avoid the consequences of its conduct and that of Greenville Steam by invoking an exception to waiver found in federal law for statutory rights evidencing public policies that would be frustrated if subject to waiver.  Research does not reveal that the Law Court has adopted this exception or that it pertains to estoppel.  Besides, the public policy

---

[52] *See* 12 McQuillin,§ 35.68 at 866 & n.8 (alleged overpayments for sewer charges cannot be recovered unless they were involuntary or made under protest).
[53] *See N.Y. v. Hill*, 528 U.S. 110, 114-15 (2000); *U.S. v. Mezzanatto*, 513 U.S. 196, 200-03 (1995); *State v. Mann*, 361 A.2d 897, 905 (Me. 1976).
[54] *Mezzanatto*, 513 U.S. at 200-01, 202, & 203.

exception to waiver does not apply here.  First, section 1202 does not govern the rates in the

Plant Rate Schedule:  the District did not set these rates under its police power, Greenville Steam

was outside the District when it voluntarily agreed to the rates, and section 1202 applies only to

amendments of the Plant Rate Schedule.  *See supra*, at 3-5 & 7-9.  As a result, barring Gallop

from pursuing two decades of refunds would have no effect on the rights established by section

1202.  Second, even if the parties had inexplicably incorporated section 1202 into the Agreement

to assess the propriety of the sewer rates that they had just agreed to, employing a statute as a

standard for private contractual obligations does not generate public policy concerns.  Third, if

waiver bars Gallop from challenging the Plant Rate Schedule under section 1202, this would not

frustrate public policy because the waiver extends only to the Plant Rate Schedule and would not

in any way impair a challenge by other users to the General Rate Schedule adopted under the

District's police power.  Contrary to Gallop's suggestion, waiver would not thwart any

protections given to the public.

## VI.   Gallop cannot unilaterally terminate the Agreement because it is compelled to connect to the System

Gallop asserts that it is not liable for sewer charges accruing under the Plant Rate

Schedule after December 2013.  It points to a letter from its attorney purporting to terminate the

Agreement.  *Stipulations* ¶ 32.  Gallop posits that the Agreement is terminable at will and that

this letter therefore ended the contract.  *Pl.'s Mot.* at 28-29.  But this theory does not withstand

scrutiny because it ducks the real question of what the parties intended when they did not include

a specified term or a termination clause in the Agreement.

Like other contract issues, the parties' intent, as revealed by the Agreement's language,

its subject matter, and the surrounding circumstances, determines the validity of Gallop's

termination notice.  *See supra*, at 4 n.10.  When these factors are weighed, it is evident that the

22

lack of a defined term for the Agreement discloses a far different intention than that of the contracting parties in the cases cited by Gallop.  Because public sewer services are highly regulated, the legal framework surrounding the Agreement is critical in determining intent.

As explained earlier, the Plant was not part of the District prior to the Agreement.  The manifest purpose of the Agreement was to change this status.  The Agreement evidences the acceptance of Greenville Steam's application to join the District and fixes the terms and conditions for doing so.  As part of the District, the Plant is now legally required to connect to the System.  The corollary is that the District has to provide wastewater treatment services to the Plant and has no more right than the Plant to terminate the Agreement.  Gallop cannot seriously contend that the District could have terminated the Agreement whenever it pleased after the Plant joined the District and began operating.

In analyzing the parties' intent, the surrounding circumstances must also be considered.  Contemporaneous with the Agreement, Greenville Steam installed a private sewer line running from a holding pit[55] on the Plant property to the District's gravity-fed sewer line that carries wastewater to the treatment facility.  DSAMF ¶ 17.  The Plant's private sewer not only comes within 200 feet of a District sewer, but actually ties into that sewer.  The Plant's buildings therefore became accessible within the meaning of the Sewer Use Ordinance.  *See id*. ¶ 14.  They remain accessible to this day.  *Id.* ¶ 19.   So unlike the situation that existed prior to the Agreement, the Plant not only is within the District but also is compelled to remain so under the Sewer Use Ordinance and 38 M.R.S. § 1160.

Given this factual and legal overlay, *i.e.*, two parties voluntarily entering into a contract for regulated public services that compels them to thereafter engage in an ongoing legal

---

[55] Industrial wastewater flows from the Plant's buildings to the holding pit, and the Plant discharges this wastewater to the System using the private sewer line.  DSAMF ¶ 18.

relationship, the absence of a specified duration shows that the parties intended that they could not terminate the Agreement at will.  Greenville Steam, which was represented by counsel, knew—or at the very least should have known—that its concurrent installation of a private sewer line that tied into the District's sewer forced the Plant to permanently maintain its connection to the System.  The Sewer Use Ordinance was attached to, and incorporated into, the Agreement. *Stipulations* ¶ 18.  Moreover, Greenville Steam agreed in its permit application to comply with the Ordinance.  DSAMF ¶ 15.  Article II of the Ordinance, titled "Use of Public Sewers Required," dictates that all accessible properties hook up to the System.  *Id.* ¶ 14.  Maine law authorizes this mandate.[56]  Like any property owner within the District, Gallop cannot unilaterally opt out of its compulsory obligations to the District.[57]  Viewed in this light, the absence of a termination clause reveals that the parties intended that neither could unilaterally terminate the Agreement.

To be clear, the District is not arguing that the Plant Rate Schedule is of indefinite duration or perpetual.  As will be shown below, because the Plant now lies within the District, the rates in the Plant Rate Schedule continue—like the rates paid by all System users—until the occurrence of an event that triggers a rate change under the District's rules, such as a shift in the use of the property.

Neither the language of the Agreement nor the surrounding circumstances indicate that the Plant was to be treated any differently than other users of the System after it entered the District.  Indeed, an implied term of the Agreement is that the Plant would have the same rights and obligations possessed by all property owners in the District.  This implied term effectuates

[56] 38 M.R.S. § 1160; *see generally* 12 McQuillin § 31.30 at 253-55 (municipalities are generally authorized to compel owners to connect to a sewer in the exercise of their police power).
[57] *See Marnickas v. Tremont Mun. Auth.,* 445 A.2d 1383, 1385 (Pa. Commw. Ct. 1982) (property owner must pay sewer charges even though not connected to sewer).

the parties' intent that the Plant's status would change from that of an outsider to part of the District.[58]  Moreover, even if such a term is not implied, Gallop cites to nothing in the Agreement divulging an intent that the Plant's admission into the District carried with it privileges or burdens different from those of other users.

The Plant's rights as a System user include the ability to invoke the District's vacant property protocol to request a rate reduction, a procedure available to all property owners within the District when the use of a property ends or otherwise changes.  Although sewer charges continue for any vacant property accessible to the System, *id.* ¶ 69, the District will reduce these rates if the property owner meets certain conditions.  Thus, if Gallop wished to change the status of its property—and the rates in the Plant Rate Schedule—after suspending Plant operations, it could do so by following the proper procedure.

The property owner initiates this procedure by requesting that the District reduce the sewer rates because the property's use has changed.  *Id.* ¶ 70.  The District follows a specific protocol for vacant properties when it receives a request:  the owner must install an expandable rubber plug in the discharge pipe to cut off any flow, after which the District physically inspects the property to verify that the plug has completely blocked the pipe.  *Id.*  When these conditions are satisfied, the District assigns a vacant property rate—also known as a readiness-to-serve charge[59]—that depends on the nature and use of the property.  *Id.* ¶ 71.  Section 1202 authorizes this charge:  "rates <u>shall</u> include rates for such district's readiness to serve charged against

---

[58] *See Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 158-59 (1st Cir. 2011); *Top of the Track Assocs. v. Lewiston Raceways, Inc.*, 654 A.2d 1293, 1295 (Me. 1995) (contract includes implied terms necessary to effectuate intent of the parties).

[59] Gallop claims that the District cannot impose a readiness-to-serve charge because the Plant is not accessible to the System.  *Pl.'s Mot.* at 30 n.28.  Gallop, however, mistakenly focuses only on whether the Plant's buildings are within 200 feet of the System.  It overlooks the fact that the Plant is accessible because its private sewer line connects to the System.  DSAMF ¶¶ 17-19.

owners of real estate, abutting to or accessible to, sewers or drains of the district, but not actually connected thereto, whether or not such real estate is improved." 38 M.R.S. § 1202 (1ˢᵗ ¶) (emphasis added).  Accordingly, Gallop remains liable for sewer charges even if it is not actually connected to the System.

But if a property owner does not request a vacant property rate, plug the discharge line, and permit the District to verify that the line has been blocked, the owner must continue to pay the full sewer charges for the property.  DSAMF ¶ 72.  The District always adheres to this protocol, and numerous examples exist of vacant properties in the District that pay the full sewer rate because the owner did not request a reduced rate or follow the District's protocol.  *Id.* ¶ 73. As a member of the District, Gallop must comply with the Sewer Use Ordinance and pay the sewer rates to which it agreed unless it applies for and receives a different status for its property.

Gallop never requested a reduced rate.  It did not even contact the District to discuss the suspension of operations at the Plant after the District's manager sent a letter asking that Gallop provide "insight as to where you stand with this property and your intentions." *Id.* ¶¶ 77 & 78. Instead of initiating the change-of-use process, Gallop tried to unilaterally terminate the contract. It then filed suit and stopped paying sewer charges other than to avoid automatic foreclosure of the District's liens.  *Stipulations* ¶¶ 35 & 36.  Gallop now asks that this Court grant Gallop a right not available to other System users—the right to walk away from its mandatory obligations to the District without liability.  But Gallop cannot point to any language in the Agreement or the Sewer Use Ordinance supporting Gallop's claim that it alone, among all the users of the System, is entitled to such special treatment.

Gallop may claim in its reply memorandum that the removal of a section of pipe in the Plant in December 2013 constitutes compliance with the District's protocol or that it rendered the

Plant inaccessible to the System.  Gallop did not notify the District of this removal or seek verification by the District of the alleged disconnection.  DSAMF ¶ 74.  The letter purporting to terminate the Agreement does not state or even intimate that Gallop believed that it had severed the Plant's connection to the System.  *Id.* ¶ 75.  In any event, cutting out a section of pipe in the Plant does not render the property inaccessible.  The Plant is accessible to the System because its private sewer remains in place and continues to tap into the District's sewer.  *Id.* ¶ 19.  Section 1202 provides that under these circumstances, the property owner must pay a readiness-to-serve charge.  The fact that the Plant no longer operates does not relieve Gallop of its obligation to pay the rates in the Plant Rate Schedule or to follow the District's vacant property protocol.[60]

Because the Plant is accessible to the System, Gallop's bid to terminate the Agreement is ineffectual.  Gallop incorrectly relies on case law holding that parties can terminate at will a contract without an express term.  *Pl.'s Mot.* at 28-29.  "The effect of the omission from a contract of the time for its duration is generally determined by the surrounding circumstances and the parties' intentions. . . ."[61]  Thus, the absence of an express term is not conclusive.  As the Law Court has emphasized, the "touchstone of contract interpretation is the intent of the parties."[62]  The intentions of the contracting parties in the cases cited by Gallop, as disclosed by the subject matter and surrounding circumstances,[63] are far removed from this case.  Greenville Steam and the District intended to enter into a continuous legal relationship for regulated public

---

[60] *See* 38 M.R.S. § 1202 (1st ¶); *Washington Realty Co. v. Mun. of Bethel Park*, 937 A.2d 1146, 1150 (Pa. Commw. Ct. 2007) ("connection must be maintained whether or not it is used"); *Kinkead v. Village of Round Lake*, 591 N.Y.S.2d 80, 81 (N.Y. App. Div. 1992) (sewer rates could be charged to uninhabitable house); 11 McQuillin § 31.30.15 at 276 (unoccupied house may be charged sewer rates because connection enhances property value); Aniteau, § 83.04(6) (unconnected property owners can be charged).
[61] 17B C.J.S. *Contracts* § 421 at 41 (1999).
[62] *Pine Ridge Realty, Inc. v. Mass. Bay Ins. Co.*, 2000 ME 100, ¶ 21, 752 A.2d 595, 601.
[63] *Roger Edwards, LLC v. Fiddes & Sons, Ltd..*, 245 F.Supp.2d 251 (D. Me. 2003) (distributorship agreement); *Burnell v. Town of Kingfield*, 686 A.2d 1072 (Me. 1996) (employment contract); *Bangor & Aroostook R. Co. v. Daigle*, 607 A.2d 533 (Me. 1992) (railroad crossing agreement).

services by permitting the Plant to hook up to the System and become part of the District. After it entered the District, the Plant had to comply with the Sewer Use Ordinance and the District's rules like any other property owner. Thus, Gallop cannot unilaterally terminate the Agreement, and it remains in effect unless and until the Plant invokes the vacant property protocol that all System users must follow.

## VII.   Gallop is not entitled to summary judgment on the counterclaim

Gallop requests summary judgment on all three counts of the Counterclaim. Count I seeks to enforce the Plant Rate Schedule and to recover damages from Gallop for all unpaid sewer fees and accrued interest. DSAMF ¶ 89. Because the Agreement is enforceable, does not violate section 1202 (to the extent this statute even applies), and has not terminated, Gallop is entitled to recover all sums due under the Plant Rate Schedule.

Gallop also seeks summary judgment on counts II (quantum meruit) and III (unjust enrichment) on the ground that Gallop has received no services or benefits from the District since the purported December 20, 2013 termination. The District, however, continues to reserve the 20,000 GPD allocated to the Plant for its exclusive use and remains ready, willing, and able to accept wastewater from Gallop. *Id.* ¶¶ 34 & 82. This valuable service, whether Gallop uses it or not, falls within the ambit of quantum meruit. In addition, unjust enrichment exists because the availability of this service confers a benefit on Gallop since it can resume operations at the Plant if it so chooses and because access to these services enhances the value of the Plant.[64] It

---

[64] *See Washington Realty*, 937 A.2d at 1150 ("mere fact that a parcel of property is connected to a sewage system provides value to the premises").

would be unjust for Gallop not to pay for this benefit.  Accordingly, Gallop is not entitled to summary judgment on counts II and III of the counterclaim.[65]

Conclusion

For the reasons sated above, the District requests that this Court deny Gallop's motion for partial summary judgment.


February 26, 2016                                       /s/ Kurt E. Olafsen___
                                                        Kurt E. Olafsen
                                                        OLAFSEN & BUTTERFIELD LLC
                                                        75 Pearl Street , Suite 215
                                                        Portland, ME 04101
                                                        207-615-0577

                                                        *Attorney for Defendant Moosehead Sanitary District*

---

[65] Gallop also requests summary judgment on Count III of its complaint declaring that lien certificates filed by the District are null and void.  Because Gallop is not entitled to summary judgment on the complaint or the counterclaim, it is not entitled to this relief.

CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2016, I filed the foregoing document with the Court's ECF filing system, which will cause an electronic notice to be sent to all counsel of record.


February 26, 2016                          /s/ Kurt E. Olafsen_____
                                           Kurt E. Olafsen

30