UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

GALLOP POWER GREENVILLE,    )
LLC,                        )
                            )
            Plaintiff,      )
                            )
      v.                    )        1:15-cv-00032-JAW
                            )
MOOSEHEAD SANITARY          )
DISTRICT,                   )
                            )
            Defendant.      )

## ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In this federal diversity action, Gallop Power Greenville, LLC (Greenville) claims that Moosehead Sanitary District (the District) breached an agreement between the parties and violated 38 M.R.S. § 1202 by charging non-uniform rates for sewage services. In view of the record and caselaw, the Court concludes that there exist genuine issues of material fact and it denies Gallop's motion for partial summary judgment.

## I.    PROCEDURAL BACKGROUND

On January 23, 2015, Gallop brought suit against the District claiming violations of their contract and applicable Maine statutory law. *Compl.* (ECF No. 2). The Complaint consists of four counts: Count I – Breach of Contract, Count II – Violation of 38 M.R.S. § 1202, Count III – Declaratory Judgment, and Count IV – Unjust Enrichment. *Id.* On March 10, 2015, the District filed its answer, which includes a counterclaim consisting of three counts: Count I – Breach of Contract,

Count II – Quantum Meruit, and Count III – Unjust Enrichment.  *Def.'s Answer to the Compl. and Countercl.* (ECF No. 10).

On January 15, 2016, Gallop moved for partial summary judgment as to liability on all causes of action it asserted against the District, and summary judgment as to liability and damages on all counts asserted by the District against Gallop in the counterclaim.  *Pl.'s Mot. for Partial Summ. J.* (ECF No. 26) (*Pl.'s Mot.*). On the same day, Gallop filed a supporting statement of material facts.  *Statement of Material Facts in Supp. of Pl.'s Mot. for Partial Summ. J.* (ECF No. 27) (PSMF).  On February 26, 2016, the District opposed Gallop's motion.  *Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Partial Summ. J.* (ECF No. 33) (*Def.'s Opp'n*).  The District also filed a response to Gallop's statement of material facts, *Def.'s Resps. to Pl.'s Statement of Material Facts & Def.'s Statement of Additional Material Facts* at 1-9 (ECF No. 34) (DRPSMF), as well as a statement of additional material facts.  *Id.* at 10-25 (DSAMF). Gallop replied to the District's opposition on March 25, 2016.  *Pl.'s Reply Mem. in Supp. of Mot. for Partial Summ. J.* (ECF No. 40) (*Pl.'s Reply*)  It also filed a reply to

the District's statement of additional material facts.  *Pl.'s Reply Statement of Material Facts* (ECF No. 41) (PRDSAMF).

## II.     FACTUAL BACKGROUND[1]

For coherence, the Court begins with the parties' stipulated facts as submitted. Next, it pieces together the facts submitted by the parties in support of their motions for summary judgment.

### A.     Stipulated Facts

#### 1.     The Parties

Gallop is a limited liability company organized under the laws of the state of Delaware with its principal place of business located in Dallas, Texas.  *Stipulated Facts* ¶ 1 (ECF No. 23) (*Stip*.).

The District is a quasi-municipal corporation organized under the laws of the state of Maine with its principal place of business in Greenville, Maine.  *Id.* ¶ 2.

The District was created pursuant to 38 M.R.S. § 1061 *et seq.* to, among other things, build, operate, and maintain a waste water disposal system in and around Greenville, Maine (the System).  *Id.* ¶ 3.  Pursuant to, inter alia, 38 M.R.S. § 1157, the District has contracted with various persons and corporations within its service territory to provide for the disposal of sewage and commercial, industrial waste and storm and surface water through the System.  *Id.* ¶ 4.  At all relevant times, the District has been the only entity that provides public wastewater and effluent

---

[1]     In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to the District's theory of the case, consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

treatment to customers in Greenville, Maine. *Id.* ¶ 5. The design capacity of the System is 170,000 gallons per day (GPD) of wastewater and other effluent. *Id.* ¶ 6. The System's capacity has not been increased since the late 1970s. *Id.* ¶ 7.

### 2.    The 1986 Negotiations & Agreement

Sometime before December of 1986, Greenville Steam Company (Greenville Steam), a Maine limited partnership that had constructed a wood-fired renewable energy power plant located in Greenville, Maine (the Plant), filed an application for approval to connect the Plant to the System. *Id.* ¶ 10. The District had sole authority to approve Greenville Steam's application. *Id.* ¶ 11.

In the subsequent negotiations on Greenville Steam's application, the District expressed concern about both the volume and quality of the wastewater to be discharged by the Plant into the System if Greenville Steam's application was approved. *Id.* ¶ 12. A letter dated August 14, 1986 from the District to Greenville Steam states that if the Plant's "daily discharge is 20,000 gal/day, [the District] will be operating at 89% capacity which obviously leaves little room for future expansion in other areas." *Id.* ¶ 15.

On or about December 4, 1986, the District entered into an agreement with Greenville Steam (the Agreement) memorializing the terms and conditions under which the Plant could discharge wastewater into the System. *Id.* ¶ 16. The Agreement included two exhibits: (a) Exhibit A: the Rate Schedule for Greenville Steam effective as of December 4, 1986 (the Plant Rate Schedule); and (b) Exhibit B:

4

the Sewer Use Ordinance (the Ordinance). *Id.* ¶ 18. The Agreement states, in part, that the District will:

> accept the discharge from [the Plant] up to a maximum of twenty thousand (20,000) gallons per day and a maximum flow rate of seventy-five (75) gallons per minute at the prevailing rate of [the District] as measured by the flow recorder referred to below in Paragraph III. The present [Plant] Rate Schedule is attached hereto (EXHIBIT A) and is a part of this Agreement. Said [Plant] Rate Schedule will be amended from time to time by [the District] and shall be binding upon [Greenville Steam] subject to the terms of 38 M.R.S.A. Sec. 1202.

*Id.* ¶ 17.

At all times relevant to this case, the District has billed customers, other than Gallop, using a flat-rate structure whereby the District assigns each customer one or more User Units, and then charges a fee per User Unit as set forth in certain Sewer Use Rate Schedules adopted periodically by the District (collectively, the General Rate Schedules). *Id.* ¶ 8. Four General Rate Schedules have been in effect at different times since October of 1986. *Id.* ¶ 9. The Plant does not fit into any of the property categories, such as "single family home," set forth in the General Rate Schedules. *Id.* ¶ 14.

The Agreement required Greenville Steam to install a flow recorder in a District manhole to record the volume of wastewater discharged into the System for the purposes of levying penalties for flows in excess of 12,000 GPD. *Id.* ¶ 20. If the $30,000 per year Basic Rate in the Plant Schedule is divided by the then applicable charge per user unit ($142.80), the result is 210 User Units. *Id.* ¶ 21. At the time the Agreement was executed (the 4th quarter of 1986), the District had 888.19 User Units in total among all of its customers, not including Greenville Steam. *Id.* ¶ 22.

The amounts charged to Greenville Steam and then Gallop have increased as the District has increased its charge per User Unit to all customers. *Id.* ¶ 23. In the opinion of the District's expert, the median water usage in Greenville is 82 GPD for single-family residences. *Id.* ¶ 24. In the opinion of Gallop's expert, the average single-family residence in Greenville discharges 300 GPD into the System. *Id.* ¶ 25.

All of the parties' knowledge regarding the negotiation and execution in 1986 of the Agreement (including the Plant Rate Schedule) comes from documents produced by the parties; no witnesses are available who have actual, contemporaneous knowledge of the negotiation and execution of the Agreement. *Id.* ¶ 13. No persons have any current recollection or knowledge as to how the parties reached the Agreement's Basic Rate or the additional penalty rates. *Id.* ¶ 19.

### 3.   Gallop's Purchase & Termination of the Agreement

In November of 2009, Gallop purchased the Plant from Greenville Steam, including Greenville Steam's title and interest in and to the Agreement. *Id.* ¶ 26. Following the Gallop purchase, the Plant continued to discharge wastewater into the System at various times. *Id.* ¶ 27. The District issued various invoices to Gallop, and Gallop paid some of these invoices. *Id.* ¶ 28. The Plant last operated on April 1, 2011. *Id.* ¶ 29. At the time the Plant ceased operations (2nd quarter of 2011), the District had 1188.45 User Units in total. *Id.* ¶ 30.

On December 20, 2013, Gallop, through counsel, sent a letter to the District (the Notice of Termination), stating, inter alia, that Gallop "hereby elects to terminate the Agreement, effective immediately" because the Plant was not operating and

6

therefore was not discharging wastewater into the System. *Id.* ¶ 32. At the time of the Notice of Termination (4th quarter of 2013), the District had 1183.95 User Units in total. *Id.* ¶ 33.

The District has taken the position that the Agreement is not, and cannot be, unilaterally terminated by Gallop. *Id.* ¶ 34. After receipt of the Notice of Termination and the cessation of Plant operations, the District continued to bill Gallop and has asserted statutory liens and filed certificates of lien (collectively, the Certificates) against the Plant in the Piscataquis County Registry of Deeds pursuant to 38 M.R.S. § 1208. *Id.* ¶ 35. Since sending the Notice of Termination, Gallop has paid $51,815.28 in sewer charges that Gallop disputes in order to prevent statutory foreclosure on the Plant from occurring pursuant to 38 M.R.S. § 1208 and the filing of the Certificates. *Id.* ¶ 36. At the time this instant lawsuit was initiated (1st quarter of 2015), the District had 1182.00 User Units in total. *Id.* ¶ 37.

### 4.   Records of Discharge

For some of the years following installation of the manhole flow meter required by the Agreement, the District recorded on an intermittent basis the volumes of Plant wastewater discharged into the System; the District has compiled those records into a spreadsheet (the District Volume Spreadsheet). *Id.* ¶ 38. The District Volume Spreadsheet contains a calculation of average GPD discharged in each quarter of the years 1999 through the second quarter of 2015. *Id.* ¶ 39. On the District Volume Spreadsheet for 1999 through the second quarter of 2015, average quarterly GPD discharged by the Plant never exceeded 3,042 (Q4 2000). *Id.* ¶ 40.

Greenville Steam and Gallop have also kept daily records since the Plant opened in 1986 that include information from an internal Plant flow meter showing wastewater volumes discharged into the System on a daily basis. *Id.* ¶ 41. These daily discharge records are shown in the Gallop Spreadsheet of Plant Operating Log Daily Wastewater Discharges to the System. *Id.* ¶ 42. Annual summaries of the daily discharge records kept by Greenville Steam and Gallop are shown in the Gallop Spreadsheet of Plant Operating Log Annual Wastewater Discharges to the System. *Id.* ¶ 43. Gallop prepared the charts titled "Gallop Power Waste Water Daily Discharge to MSD 1" and "Gallop Power Waste Water Daily Discharge to MSD 2" to show the Plant's GPD discharges to the System for the period from January 1, 2008 through April 1, 2011. *Id.* ¶ 44. The System is currently operating in the "lower 80 percentile" of GPD capacity. *Id.* ¶ 45.

The District calculates the per-User Unit charge to customers by dividing the total revenue needed by the total amount of then-outstanding User Units. *Id.* ¶ 46. The District has prepared a spreadsheet containing data in five-year increments beginning in 1987 and continuing through 2012, plus data for 2015, that demonstrates that the amounts the District charged Greenville Steam and then Gallop under the Agreement ranged from 17.7% to 18.3% of the District's total billing to customers in each of those years (the District Billing Spreadsheet). *Id.* ¶ 47.

**B.    The Parties' Statements of Fact**

       **1.    The 1986 Negotiations**

The business records of the District contain correspondence and other documents exchanged in 1986 by the District and Greenville Steam, the owner of the Plant, and Swift River/Hasflund Company (Swift River), the developers of the Plant, during the negotiations leading up to the Agreement dated December 4, 1986. DSAMF ¶ 1; PRDSAMF ¶ 1.  Both the District's Rule 30(b)(6) designee, Danny J. Daigle, and its expert, Christopher P.N. Woodcock, agree that various correspondence from Gallop's predecessors to the District and its representatives in the District's file indicate that for Gallop's predecessors, time was of the essence in getting the Agreement finalized and the Plant connected to the System.  PSMF ¶ 3; DRPSMF ¶ 3.  The District would not approve Greenville Steam's application or allow the Plant to be fully-connected to the System until the parties had executed a contract that, among other things, would set forth the billing structure for Plant use of the System. PSMF ¶ 4; DRPSMF ¶ 4.

### a.    Initial Discussions

David Young of Swift River sent a letter to Hubbard Trefts of the District dated March 28, 1986, the reference line of which states "Re: Greenville Steam Company - Wastewater Discharge Quantity."  This letter states, in part:

> Using untreated well water will mean sending a maximum of 29,400 gpd and an average annual rate of 25,000 gpd to MSD in order to maintain boiler water quality.
> . . . .
>
> We would like to have the Board consider the idea of establishing a formal agreement with Greenville Steam Company which would allow us to discharge wastewater in excess of 20,000 gpd for a limited period of time so that the possibility of well flushing can be fully explored prior to deciding on an alternate course of action.

9

DSAMF ¶ 2; PRDSAMF ¶ 2.

The minutes for the August 7, 1986 meeting of the Board of Trustees of the District state, in part: "6. Swift River - discussion on limits, quality, quantity, monitoring hook-up, etc. - letter will be sent to them asking to definitely reply to these questions and their guarantees - info deadline to be set as 9-15-86 so it will be reviewed and decided upon by October meeting of MSD."  DSAMF ¶ 3; PRDSAMF ¶ 3.

### b.     Concerns re: Greenville Steam's Application

Greenville Steam submitted an Industrial Sewer Connection Application to the District dated August 12, 1986.  DSAMF ¶ 4; PRDSAMF ¶ 4.

Hubbard Trefts, Chairman of the Board of Trustees of the District, sent a letter dated August 14, 1986 to William Locke, Plant Manager of Greenville Steam Company. The second and third paragraphs of this letter state, in part:

> One of the most critical pieces of information needed is your estimate of your daily and maximum rates of discharge into our system. . . . MSD's concern and need for reliable data from you is required since MSD is responsible to serve the entire sewered communities of Greenville, Little Squaw, as well as the Greenville Steam Company, and still retain some additional capacity for possible future expansion in other areas of the community.

> This comment about our future capacity becomes very important for two reasons. First, if your daily discharge is 20,000 gal/day, MSD will be operating at 89% capacity which obviously leaves little room for future expansion in other areas. . . . Obviously we need to know your final discharge parameters so that equitable rates and other matters can be finalized.

DSAMF ¶ 5; PRDSAMF ¶ 5.

The fourth paragraph of this letter states, in part:

> Other vital information that has not been made available to MSD is the character of the proposed discharge concerning pH, temperature, BOD [Biochemical Oxygen Demand], and suspended solids. This information becomes critical since our normal treatment is biological and thus likely to be strongly influenced by adverse effluent characteristics. We understand that in starting up a new plant such as yours, some of this information may be difficult to obtain prior to actual discharge, however MSD must have these data in some tangible form so it can be assured that your discharge characteristics will be compatible with our treatment system.

DSAMF ¶ 6; PRDSAMF ¶ 6.

The fifth paragraph of this letter states, in part: "A third factor of great importance is that MSD must have a means of constantly monitoring your discharge to determine average and peak flows as well as the aforementioned effluent characteristics."  DSAMF ¶ 7; PRDSAMF ¶ 7.

### c.    Greenville Steam's Responses re: Concerns

W. H. Locke, Plant Manager for Greenville Steam and Swift River, sent a memorandum dated September 23, 1986 to Llew Wortman, the District's Plant Manager, which states, in part:

> There has been many estimates concerning our maximum discharge rates depending on whether we use town or well water.  We will never exceed the 20,000 GPD average that was previously set by the Sanitary District.  If necessary we will make other arrangements for waste water disposal.  As noted on the attached letter, our actual expected rate will run between 10,000 and 12,000 GPD.  We are presently looking at alternatives to lower our waste water output even further.

DSAMF ¶ 8; PRDSAMF ¶ 8.[2]

---

[2]    Gallop admits the statement accurately reproduces a portion of the September 23, 1986 memorandum but provides the next two sentences of that letter.  PRDSAMF ¶ 8.  The record supports the qualification, which the Court included.  *See* DRPSMF Attach. 8 *Mem. from W.H. Locke to Llew Wortman* (Sept. 23, 1986) (ECF No. 34).

11

The minutes for the October 2, 1986 meeting of the Board of Trustees of the District state, in part: "6. Swift River permit application - William Locke gave presentation as to quality and quantity - discussion was held – motion made . . . to hook up with plug and to be unplugged when contract is signed and agreed upon. . . ."  DSAMF ¶ 9; PRDSAMF ¶ 9.

### d.    Finalizing the Agreement

Angus King, Jr., General Counsel of Swift River, sent a letter dated November 25, 1986 to J. William Batten, the attorney for the District, which states, in part:

> I have recently reviewed the proposed Agreement between the Moosehead Sanitary District and the Greenville Steam Company in connection with the expected discharge from the Greenville Steam facility. Enclosed are red-lined and clean copy of a redraft of that Agreement making several changes we feel are necessary in connection with its provisions.
>
> The modifications we would like to suggest are as follows:
> . . . .
> b. We understand that the rates must change from time-to-time and have no problem with this concept; on the other hand, we feel that any change in rates should be consistently applied to other customers of the District and therefore have added some language as noted in an attempt to establish this principle.

DSAMF ¶ 10; PRDSAMF ¶ 10.[3]

---

Gallop further directs the Court to DRPSMF ¶¶ 17-21, "wherein the District admits that Greenville Steam did in fact identify and put into effect a mechanism – the Moosehead Lake pipeline – that 'lower[ed] . . . waste water output even further.'" PRDSAMF ¶ 8. These facts are already reflected in the record and therefore the Court makes no further modifications to the statement.

[3]    Gallop objects to this statement:

> Should be stricken. Upon information and belief, the District is propounding this statement in an attempt to improperly introduce parol evidence when the relevant language of the Agreement – "Said [Plant Rate Schedule] will be amended from time to time by [the District] and shall be binding upon [Greenville Steam] subject to the terms of 38 M.R.S.A. § 1202" – is clear and can be interpreted without resort to extrinsic evidence.

Attorney King's letter dated November 25, 1986 to the District's attorney enclosed a redlined version of the draft agreement that included, among other proposed revisions, adding the following language to the end of the last sentence of section I after the words "binding upon the Greenville Steam Company": "provided such amended rates apply pro rata to all other customers of the District."  DSAMF ¶ 11; PRDSAMF ¶ 11.[4]  In place of the language Attorney King proposed, the signed version of the Agreement dated December 4, 1986 substituted the following at the end of the last sentence of section I: "subject to the terms of 38 M.R.S.A. Sec. 1202." DSAMF ¶ 12; PRDSAMF ¶ 12.[5]

The minutes for the December 4, 1986 meeting of the Board of Trustees of the District state, in part: "4. Greenville Steam Company - Presented a case of what

---

PRDSAMF ¶ 10 (citing *Zavota v. Ocean Accident & Guarantee Corp.*, 408 F.2d 940, 943 (1st Cir. 1969); *Portland Regency, Inc. v. RBS Citizens, N.A.*, 2:12-CV-408-DBH, 2015 WL 1279628, at *4 (D. Me. Mar. 20, 2015); *Portland Valve, Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1388-89 (Me. 1983); *Linscott v. Fernald*, 5 Me. 496 (1829)).

 The Court agrees that the relevant language of the Agreement is clear and can be interpreted without resort to extrinsic evidence.  *See infra* Section IV.A.2.  Therefore, to the extent that the statement is being offered to "alter, augment, or contradict the unambiguous language of an integrated written agreement" it will not be considered.  *See EnQueue, Inc. v. Data Mgmt. Grp., Inc.*, 566 F. Supp. 2d 13, 22 (quoting *Handy Boat Serv., Inc. v. Prof'l Servs., Inc.*, 1998 ME 134, ¶ 11, 711 A.2d 1306). However, the Court finds that this statement is relevant to other considerations, such as whether the parties freely entered into the Agreement, and therefore admits the statement for these other purposes.

 Gallop also qualifies the statement.  It admits that the statement accurately reproduces a portion of the November 25, 1986 letter from Attorney King to Attorney Batten, but answers further:

> [T]o the extent that the District is arguing that this language is supposed to bolster the District's argument that Greenville Steam and the District agreed that the original Plant Rate Schedule would fall outside the scope of M.R.S.A. § 1202, that argument is unfounded because the District represented multiple times that § 1202 would apply.

PRDSAMF ¶ 10.  Gallop goes on to cite statements in the record which it alleges support its claim that the District represented that section 1202 would apply.  *Id.*

 The Court rejects Gallop's qualification as the "facts" it seeks to admit are legal arguments. *See* D. ME. LOC. R. 56(d).

[4] *See supra* note 3.

[5] *See supra* note 3.

chemicals and effluent they will be discharging, representative from Nutmeg Chemical spoke; contract discussed; rate schedule discussed . . . Chairman will sign contract. . . ." DSAMF ¶ 13; PRDSAMF ¶ 13.

The Chairman of the District Board of Trustees and a representative of Greenville Steam's general partner signed the Agreement and their signatures were witnessed; above the parties' signatures, the Agreement states: "WITNESS our hands and seals the day and year written above."  PSMF ¶ 28; DRPSMF ¶ 28.

The Agreement is silent as to its terms and has no express termination mechanism.  PSMF ¶ 15; DRPSMF ¶ 15.

### 2.    The Plant's Connection to the System

Article II of the District's Sewer Use Ordinance is titled "Use of Public Sewers Required" and states, in part:

> SEC. 2 - Every building in the sanitary district . . . with facilities for discharge or disposal of sewage or commercial or industrial waste, which is accessible to a sewer or drain of such district shall have a sanitary sewer, or drainage system which shall be caused to be connected with such sewer or drain of the district by the owner or person against whom taxes on the premises are assessed, in the most direct means possible. . . A building shall be deemed to be accessible to a sewer or drain of the district for the purposes of this section if such building, or any private sewer or drain directly or indirectly connected thereto or carrying sewage or commercial or industrial waste therefrom, shall at any point be or come within 200 feet of a sewer or drain of the district . . . .

DSAMF ¶ 14; PRDSAMF ¶ 14.  In its Industrial Sewer Connection Application dated August 12, 1986, Greenville Steam agreed "[t]o accept and abide by all provisions of [sic] Ordinance of the Moosehead Sanitary District, and of all other pertinent ordinances or regulations that may be adopted in the future."  DSAMF ¶ 15; PRDSAMF ¶ 15.  When Greenville Steam submitted its Industrial Sewer Connection

14

Application dated August 12, 1986 to the District, there was no private sewer or drain connected to a building on the Plant property, or carrying industrial waste from any such building, that at any point was within 200 feet of a sewer or drain of the District. DSAMF ¶ 16; PRDSAMF ¶ 16.  It is the District's position that before entering into the Agreement, Greenville Steam could have built its own treatment system and obtained its own discharge permit; it is Gallop's position that small power plants, like the Plant, rarely have their own treatment facilities.  DSAMF ¶ 20; PRDSAMF ¶ 20.[6]

The Plant was built in 1986 and commissioned in 1987; following a period of testing, it began running at close to full capacity in late 1989.  PSMF ¶ 16; DRPSMF ¶ 16.  After submitting its Industrial Sewer Connection Application dated August 12, 1986 to the District, Greenville Steam installed a private sewer connected to the

---

[6]      Gallop objects: "Should be stricken.  Mr. Woodcock's testimony is unsupported by any factual basis or other proper foundation for his bald assertion that 'they could have built their own system, could have gotten their own discharge permit.'"  PRDSAMF ¶ 20.  Gallop notes that Mr. Woodcock is the District's expert and "did not review any documentation or data that would allow him to know whether Gallop and its developers had the ability – financial or otherwise – to build its own treatment system and then obtain a discharge permit."  *Id.* (citing *id.* Attach. 2 *Dep. of Christopher P.N. Woodcock*, 16:20-19:5, 29:11-30:24 (*Woodcock Dep.*)).  It argues that given Woodcock's "unfamiliarity" with Greenville Steam and Gallop, his statement is "simply inadmissible speculation."  *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1996); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); FED. R. EVID. 702, 703)).

Viewing the facts in the light most favorable to the District, the Court finds that the documentation and data that Mr. Woodcock relied upon, as well as his experience with water and wastewater issues, are sufficient to establish his opinion that Greenville Steam could have built its own treatment system and obtained its own discharge permit.

Gallop also qualifies the statement noting that although it may have been theoretically possible to build its own treatment plant and obtain a discharge permit, it had already long before been granted permission to discharge water into the System.  PRDSAMF ¶ 20.  It further notes that Gallop's 30(b)(6) designee testified that "small power plants like this – I would have to say 99 percent of the time they would not have their own treatment facilities."  *Id.* (citing *id.* Attach. 4 *Dep. of Michael Graul*, 57:12-58:20 (*Graul Dep.*)).

The Court accepts Gallop's qualification in part.  It finds that the first part of the qualification, that Gallop had already been granted permission, is not responsive to the statement.  The Court interprets the District's statement to suggest that before seeking this permission, Gallop had other options.  However, the Court does include the second part of the qualification, namely that Gallop's position is that it is rare for treatment facilities of Gallop's size to have their own treatment facilities, based on the testimony of Mr. Graul.  *See Graul Dep.*, 57:12-58:20.

Plant that runs from a holding pit on the Plant property to the property line, then through property owned by a third party and underneath a town way and railroad tracks before connecting to the District's gravity-fed sewer line that carries wastewater to the treatment facility. DSAMF ¶ 17; PRDSAMF ¶ 17. Industrial wastewater flows from the Plant's buildings to the holding pit, and the Plant discharges this wastewater to the System using the private sewer line. DSAMF ¶ 18; PRDSAMF ¶ 18. The District did not need to take any new or different measures or make any modification to the System in order to process wastewater introduced into the System on account of the connection of the Plant to the System. PSMF ¶ 12; DRPSMF ¶ 12. The private sewer installed by Greenville Steam remains in place and still connects to the District's gravity-fed sewer line. DSAMF ¶ 19; PRDSAMF ¶ 19.[7]

In 1989, Greenville Steam began construction of a pipeline to draw water from Moosehead Lake for use in the Plant; this water was significantly lower in silica content than the well water the Plant had been mixing with town water for cooling purposes before the pipeline was built. PSMF ¶ 17; DRPSMF ¶ 17.[8] Before

---

[7]   Gallop denies the statement, alleging that the District "admits in [DRPSMF] ¶ 22 that 'Gallop removed a section of the discharge pipe in the Plant that connects the Plant to the District's System; the Plant has remained disconnected from the System since that time.'" PRDSAMF ¶ 19.

   Viewing the facts in the light most favorable to the District, the Court finds that the two statements are not contradictory. The Court interprets DSAMF ¶ 19 to say that the private sewer, which is underground, remains and still connects to the District's gravity-fed sewer line. The Court interprets DRPSMF ¶ 22, however, to concern removal of a portion of the discharge pipe that is located inside the Plant. Therefore, the Court rejects the denial and admits DSAMF ¶ 19 into the record.

[8]   The District denies the statement: "The phrase 'In 1990, Greenville Steam began construction of a pipeline' is supported by the affidavit of Michael Graul but contradicted by his cited deposition testimony as the Rule 30(b)(6) designee of Gallop. The deposition testimony states that 'In 1989, they ended up installing a new pipeline . . .'" DRPSMF ¶ 17 (citing PSMF Attach. 6 *Dep. of Michael Graul*, 15:4-5). The District argues that because the affidavit provides no explanation for the conflict between

construction of the pipeline, the high silica content in the well water required Greenville Steam to drain a portion of the concentrated silica from the Plant's turbine cooling system daily, which sometimes caused significant discharge of wastewater into the District's System.  PSMF ¶ 18; DRPSMF ¶ 18.  The new pipeline allowed Greenville Steam (and then Gallop) to use lake water for turbine cooling, thereby eliminating the use of high-silica well water for cooling; town water use was also reduced.  PSMF ¶ 19; DRPSMF ¶ 19.  This change in water source decreased by a very large amount the volume of Plant wastewater flowing when the Plant was operating.  PSMF ¶ 20; DRPSMF ¶ 20.  The pipeline remains in place today, and if the Plant were ever restarted, it would be able to continue using lake water instead of well water for operating purposes.  PSMF ¶ 21; DRPSMF ¶ 21.

In December of 2013 (after the cessation of Plant operations in April of 2011), Gallop removed a section of the discharge pipe in the Plant that connects the Plant to the District's System; the Plant has remained disconnected from the System since that time.  PSMF ¶ 22; DRPSMF ¶ 22.[9]  The Plant property does not abut any

---

these record citations, the deposition testimony governs for purposes of summary judgment.  *Id.* (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)).

The Court agrees that where a deposition and affidavit conflict, the deposition controls, unless there is a satisfactory explanation for why the testimony changed.  *See Colantuoni*, 44 F.3d at 4-5. Therefore, the Court modified the statement to reflect the year provided in the deposition testimony.

[9]      Gallop also seeks to admit the statement: "38 M.R.S. § 1202 permits the District to impose 'readiness to serve charges' on property owners whose properties abut or are accessible to the System, even if those properties are not actually connected to the System."  PSMF ¶ 23.

The District objects to and denies the statement:

> This paragraph should be stricken because it is not factual in nature and attempts to characterize statutory language. *See* Local Rule 56(b) (motion for summary judgment shall be supported by a separate, short, and concise statement of materials facts"). Without waiving this objection, the District denies this paragraph because it mischaracterizes the statute by including the words "permits" and "the System" in place of the statutory language.

roadway where a District System line is installed; in addition, all structures on the Plant property are more than 200 feet away from any District System line.  PSMF ¶ 24; DRPSMF ¶ 24.

### 3.   The Fee Structures

#### a.   The District's General Rate Schedule

Both the District's Rule 30(b)(6) designee and its expert believe that 38 M.R.S. § 1202 requires that every District customer "pays a fair proportion of the cost of operating the [System]."  PSMF ¶ 26; DRPSMF ¶ 26.  The District's expert concedes that where a sanitary district uses a flat fee billing structure with User Units, such as the District's billing structure, there needs to be some relation between the number of User Units charged to a customer and the amount of service received from the treatment facility.  PSMF ¶ 27; DRPSMF ¶ 27.[10]

The District's adoption of a flat-fee rate structure was necessary and appropriate because water usage data is not available for some District customers.  DSAMF ¶ 24; PRDSAMF ¶ 24.  The District cannot base its sewer rates on water usage because some of its customers are not connected to the Greenville water utility but instead draw their water from private non-metered sources, such as drilled and dug wells and Moosehead Lake.  DSAMF ¶ 23; PRDSAMF ¶ 23.  The District assigns

---

DRPSMF ¶ 23.
  The Court agrees with the District's objection and denies this statement as it is not a "fact" but a legal characterization not properly presented in the statement of facts.  *See* D. ME. LOC. R. 56(b).
[10]   The District denies the statement alleging that the record citations do not support the phrase "the amount of district resources consumed by that customer."  The Court agrees that the record does not support this phrase.  The record states that the amount charged needs to have some relation to "how much service you're getting from the treatment facility."  *See Woodcock Dep.*, 97:14-98:16.  The Court adjusts the record accordingly.

user units based on the use of a property and the amount of capacity allocated to that type of use, not on the amount of wastewater actually discharged by a user.  DSAMF ¶ 26; PRDSAMF ¶ 26.  A single-family residence is assigned one user unit regardless of the size of the home, the number of bathrooms, the number of occupants, and whether the residence is occupied year-round, seasonally, or is vacant.  DSAMF ¶ 27; PRDSAMF ¶ 27.

Sanitary districts commonly do not base sewer rates on wastewater discharges because the discharges for most users contain solid wastes which clog flow meters, making these meters impractical and prohibitively expensive.   DSAMF ¶ 21; PRDSAMF ¶ 21.[11]  A flat-fee rate structure is not based on actual GPD discharged; however, there must be some way to compare system use by various types of customers to ensure that each customer is paying its fair share.  DSAMF ¶ 22; PRDSAMF ¶ 22.[12]  Setting sewer rates based on the use of a property and the amount of capacity allocated for that type of use is an accepted and valid method for setting rates.  DSAMF ¶ 25; PRDSAMF ¶ 25.  Mathematical precision in setting sewer rates

[11]    Gallop qualifies the statement, answering further that "the District demanded, and Greenville Steam installed, a flow meter so that the District would, to use its own words 'have a means of constantly monitoring your discharge to determine average and peak flows as well as the aforementioned effluent characteristics' to ensure that 'equitable rates can be finalized.'"  PRDSAMF ¶ 21 (citing *Stip.* ¶ 20).  Gallop also notes that "the District did in fact monitor the flow meter, keeping records of average and peak flows (with peak flows in excess of $12,000 GPD triggering penalty rates) throughout the parties' relationship." *Id.* (citing *Stip.* ¶¶ 38-39).
    The record already accurately reflects these statements, *see Stip.* ¶¶ 20, 38, 39, and therefore the Court rejects the qualification here.
[12]    Gallop qualifies the statement, noting that "[w]hile there does not need to be a direct linear relationship between the flat-fee rate structure and GPD discharged by a given customer, both the District's expert, Mr. Woodcock, and Gallop's expert, Carl Quiram, agree that there must be some way to compare system use by various types of customers to ensure that each customer is paying its fair share."  PRDSAMF ¶ 22 (citing *Woodcock Dep.*, 51:8-54:25, 97:14-98:16; PRDSAMF Attach. 5 *Quiram Aff.* ¶¶ 1, 5, 7 (*Quiram Aff.*)).  The qualification is supported by the record and the Court includes it.

is not feasible and is not required for sewer rates to be uniform.  DSAMF ¶ 32;

PRDSAMF ¶ 32.

### b.      The Plant Rate Schedule

The District created Draft Rate Schedules at various times before the

Agreement was finalized and executed, which proposed the following potential

payment schedules:

- A "Basic Rate" of 70 User Units plus penalties rates for daily uses at volumes beginning at 10,000 GPD, with no base annual dollar payment amount.
- A Basic Rate of $20,000 per year plus penalty rates for daily uses at volumes beginning at 10,000 GPD with no reference to User Units.
- A Basic Rate of $30,000 per year plus penalty rates for daily uses at volumes beginning at 10,000 GPD with no reference to User Units.

PSMF ¶ 1; DRPSMF ¶ 1.  The District has no knowledge as to how it created any of

the proposed payment schedules in the preceding paragraph.  PSMF ¶ 2; DRPSMF ¶

2.

The Plant Rate Schedule in the finalized Agreement assigned Greenville

Steam 210 User Units and the Basic Rate is premised on the Plant discharging 12,000

GPD into the System and contains penalty rates for daily discharges (a) between

12,000 GPD and 20,000 GPD; and (b) greater than 20,000 GPD.  PSMF ¶ 5; DRPSMF

¶ 5.  Even if the Plant did discharge wastewater in the amounts contemplated during

the Agreement negotiations (i.e., 20,000 GPD), the District's increased operating

costs would only increase "by a very small degree" (consisting primarily of some

increased pumping costs and increased chemicals to treat the effluent) because the

current System capacity could handle those projected flows.  PSMF ¶ 14; DRPSMF ¶ 14.

Article III of the District's Sewer Use Ordinance states, in part, the following: "SEC. 2 – There shall be two (2) classes of building sewer permits: (a) for residential and commercial service, and (b) for service to establishments producing industrial wastes."  DSAMF ¶ 64; PRDSAMF ¶ 64.[13]  The Plant is the only System user that discharges industrial wastes; all other users are classified as residential or commercial.  DSAMF ¶ 65; PRDSAMF ¶ 65.[14]  The 210 user units assigned to the

---

[13]     Gallop both objects to and admits this statement.  It premises its objection on the claim that the quoted provision of the Sewer Use Ordinance, which deals with construction permits, is not "relevant to a given user's use of the System or the amounts charged for that use" and therefore not material.  PRDSAMF ¶ 64 (citing *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986))).

        Viewing the facts in the light most favorable to the District, the Court finds that this fact is relevant and material.  According to the District, the nature of the discharge and the character of a user are important considerations in determining the rates to charge.  Since the District's calculations of Gallop's rates is one of the main issues in this case, "a dispute over [this fact] might affect the outcome of a suit under governing law."  *See Holcomb*, 477 U.S. at 248.  The Court overrules the objection.

[14]     Gallop both objects to and denies this statement.  It premises its objection on the claim that the statement is irrelevant and thus immaterial because "the District did not need to take any new or different measures or make any modifications to the System in order to process wastewater introduced into the System on account of the connection of the Plant to the System."  PRDSAMF ¶ 64 (citing *Holcomb*, 477 U.S. at 248).  Viewing the facts in the light most favorable to the District, the Court finds that this fact is relevant and material.  *See* discussion *supra* note 13.  The Court overrules the objection.

        Gallop denies the statement noting that the Sewer Use Ordinance defines "Industrial Wastes" as "liquid wastes from industrial manufacturing processes, trade or business as distinct from sanitary sewage."  *Id.* (citing DSAMF Attach. 11 *Sewer Use Ordinance*, art. I, § 6 (*Ordinance*)).  Gallop claims that Greenville is home to multiple businesses that discharge "liquid waste" and that meet this definition.  *Id.*  Viewing the facts in a light most favorable to the District, the Court finds that the record supports the District's statement.  The Court interprets the definition of industrial wastes to mean the liquid wastes coming from industrial manufacturing processes or industrial manufacturing trade or businesses.  *See Ordinance*, art. I, § 6.  The businesses that Gallop lists are not industrial manufacturing businesses.  Therefore, the Court accepts the District's statement that the Plant is the only System user that discharges industrial waste.

        Gallop further answers that the District denies that the Plant is an industrial user:

        Q:     Would [the Plant] be characterized as an industrial customer?
        A:     No.
        Q:     How are they characterized by the District, if at all?

Plant is more than 165 units higher than the next highest number of units assigned to a property owner.  DSAMF ¶ 66; PRDSAMF ¶ 66.  The Plant's discharges are quantitatively and qualitatively different from the discharges by the District's residential and small business customers.  DSAMF ¶ 67; PRDSAMF ¶ 67.[15,16]

The Parties have no records as to how the District or Greenville Steam arrived at either the $30,000 "BASIC RATE" (the Basic Rate) set forth in the Agreement's Plant Rate Schedule or the additional penalty rates set forth therein ($.0125/gallon for discharge between 12,000 GDP and 20,000 GPD and $.025/gallon for discharge in excess of 20,000 GPD); similarly, no persons have any recollection or knowledge as to how the District or Greenville Steam arrived at either the Basic Rate or the additional

---

A:      By the Rate Schedule itself.
Q:      When you say "the rate schedule" do you mean the rate schedule that was attached to the agreement between Greenville Steam and the District [i.e., the Plant Rate Schedule]?
A:      Yes.

PRDSAMF ¶ 65 (citing PSMF Attach. 3 *Daigle Dep.*, 11:9-18 (*Daigle Dep.*)).

    Viewing the facts in the light most favorable to the District, the Court finds that the record supports the District's statement and rejects the denial.  The portion of the transcript Gallop cited does not deny that the Plant discharges industrial waste; it states that it is not characterized as an industrial customer, but by the rate schedule itself.  *See Daigle Dep.*, 11:9-18.  Mr. Daigle also testified that there are no other customers similar to the Plant.  *Id.* 11:6-8.  The Plant may discharge industrial waste and at the same time not be characterized as an industrial customer given that the parties negotiated their own Agreement.

[15]    Gallop both objects to and admits this statement.  *See supra* note 14 for a discussion on the objection.  The Court admits the statement.

[16]    The District seeks to admit the statement: "Because the Plant is the largest user of the System by far and the only industrial user, and because it discharges wastewater that is quantitatively and qualitatively different from the discharges of other users of the System, the rates in the Plant Schedule are not unreasonable, arbitrary, or discriminatory."  DSAMF ¶ 68.

    Gallop denies this statement noting that its own expert witness, Mr. Quiram, disagrees, especially given the fact that the District did not need to make any changes to the System's capacity or treatment protocol to handle the Plant's discharge.  PRDSAMF ¶ 68 (citing *Quiram Aff.* ¶ 8, 9).

    The Court accepts this denial and omits the statement from the record.  The statement that the rates are "not unreasonable, arbitrary, or discriminatory" is not a "fact" but an argument, not properly presented in a statement of additional material facts.  *See* D. ME. LOC. R. 56(c).  As Gallop continues to make this argument, the Court will refer back to this footnote.

penalty rates set forth therein.  PSMF ¶ 6; DRPSMF ¶ 6.[17]  The District has no knowledge as to whether there is a mathematical or financial relationship between the $30,000 Basic Rate and any costs the System would incur from having to process Plant wastewater from and after December 4, 1986.  PSMF ¶ 7; DRPSMF ¶ 7.  The District's expert does not know if there is mathematical or financial relationship between the 210 User Units assigned to the Plant by the Plant Rate Schedule and the entire universe of User Units issued by the District at any given time.  PSMF ¶ 8; DRPSMF ¶ 8.  The District's expert does not know if there is a mathematical or financial relationship between the $30,000 Basic Rate and any costs the System would incur from having to process Plant wastewater from and after December 4, 1986.  PSMF ¶ 9; DRPSMF ¶ 9.

According to the testimony of Danny J. Daigle, the District's Rule 30(b)(6) designee, in his experience, the meeting minutes of the District Board would always contain information about decisions on how much to charge various customers.  PSMF ¶ 10; DRPSMF ¶ 10.[18]  To the best of Mr. Daigle's knowledge, the Agreement with Greenville Steam is the only time that the District has provided service to a customer where billing to the customer was not determined by first setting the amount of User Units in order to derive a billing figure; in his experience, the District,

---

[17]     The District qualifies this statement stating that "[b]ecause both the District and Greenville Steam were parties to the Agreement, the rates in the Plant Rate Schedule were 'arrived at' by not only the District but also Greenville Steam."  DRPSMF ¶ 6.  Viewing the facts in the light most favorable to the District, the Court accepts this qualification and adjusts the record accordingly.

[18]     The District denies this statement on the ground that it is not supported by the record citation. It alleges that the record citation only states that a decision as to how much to charge a customer is put into the minutes.  DRPSMF ¶ 10.  The Court agrees that part of the statement is not supported by the record and adjusts the statement accordingly.  *See Daigle Dep.*, 72:13-19.

in determining pricing and billing for a customer, always starts with the number of User Units and works from there to a dollar figure.  PSMF ¶ 11; DRPSMF ¶ 11.[19]

The District has never amended the Plant Rate Schedule: the 210 user units assigned to the Plant and the charges for discharges exceeding 12,000 GPD have not changed since the Agreement was signed.  PSMF ¶ 13; DRPSMF ¶ 13; DSAMF ¶ 28; PRDSAMF ¶ 28.  Increases in the user unit fee since 1986 have been applied pro rata to all customers of the District, including the Plant, based on how many user units are assigned to each customer.  PSMF ¶ 13; DRPSMF ¶ 13; DSAMF ¶ 29; PRDSAMF ¶ 29.

In the opinion of Christopher Woodcock, an expert in water and wastewater rates and related issues, the District's assessed wastewater rates, including those in the Plant Rate Schedule and in the District's general rate schedule, are uniform and are not unreasonable, arbitrary, or discriminatory.  DSAMF ¶ 30; PRDSAMF ¶ 30.[20] Mr. Woodcock's expert opinion that the rates in the Plant Rate Schedule are not unreasonable, arbitrary, or discriminatory is based on: the reservation of 20,000 GPD for the Plant's exclusive use, the Plant's peak discharges to the System, the remaining capacity in the System after 20,000 GPD was reserved for the Plant's exclusive use, concerns about the nature and quality of the Plant's discharges, and the Plant's

---

[19]    The District denies the statement noting the word "proper" and the phrase "the customer is expected to use" are not supported by the record citations.  DRPSMF ¶ 11.  The Court agrees that these portions of the statement are not supported by the record and adjusts the statement accordingly. *See Daigle Dep.*, 64:24-65:13, 77:13-25, 95:22-96:1.

[20]    Gallop qualifies this statement to admit that it is Mr. Woodcock's opinion but answers further that its own expert disagrees.  PRDSAMF ¶ 30 (citing *Quiram Aff.* ¶¶ 1-5).  Given the conflicting expert opinions, the Court includes both the District's statement and Gallop's qualification.

unique status as the only industrial user of the System.  DSAMF ¶ 31; PRDSAMF ¶ 31.[21]

In the opinion of Carl Quiram, another expert in water and wastewater rates and systems, the rates, as applied to the Plant, Greenville Steam, and Gallop, are not uniform, but are unreasonable, arbitrary, and discriminatory.  PRDSAMF ¶ 30.  Mr. Quiram's expert opinion is based on the following asserted facts: the District's inability to explain how the Plant Rate Schedule was calculated, the District's inability to link the metrics to any increased costs of operating the System, the District's inability to demonstrate how a User Unit is related to actual System use or operating costs, the Plant's lack of need to alter either the physical capacity of the System or its treatment protocols, the District's access to actual Plant water discharge volume readings, the District's representation that it would use actual discharge data obtained from the flow meter to ensure equitable rates, the absence of any District request for an alteration to the Agreement to allocate System capacity to other users, the approximately  10% increase of non-Plant user Units since the Plant came online, and assuming the average single family residence discharges 300 GPD into the System, the Plant should have been assigned 40 User Units if the Plant discharged 12,000 GPD.  PRDSAMF ¶ 31.

### 4.      The System's Capacity

---

[21]      Gallop qualifies this statement to admit that Mr. Woodcock's opinion is based on the factors listed in DSAMF ¶ 31, but it answers further postulating the basis for its own expert's opinion. PRDSAMF ¶ 31.  The Court includes Gallop's qualification.

The District reserved 20,000 GPD of the System's capacity for the Plant's exclusive use because the Agreement obligates the District to accept discharges from the Plant up to this amount.  DSAMF ¶ 33; PRDSAMF ¶ 33.[22]  The District continues to reserve 20,000 GPD of capacity for the Plant.  DSAMF ¶ 34; PRDSAMF ¶ 34.[23] The 20,000 GPD of capacity reserved for the Plant cannot be allocated to other users

---

[22]     Gallop qualifies this statement, admitting that the Agreement provides that the District will "accept discharge from the Plant up to a maximum of twenty thousand (20,000) gallons per day" but denies that this flow capacity was reserved "for the Plant's exclusive use."  PRDSAMF ¶ 33.  Gallop argues that in fact, the Plant Rate Agreement contemplated that GPD would, for the most part, stay below 12,000 GPD.  *Id.*  Gallop goes on to state that its own expert believes that as a practical matter, the District only reserved 12,000 GPD.  *Id.* (citing *Quiram Aff.* ¶ 16).

     Viewing the facts in the light most favorable to the District, the Court rejects this qualification. Given that the District agreed to accept up to 20,000 GPD from the Plant, one can infer that it did, in fact, reserve 20,000 GPD of the System's capacity for the Plant's exclusive use, as stated in the declaration of the District's manager.  *See* DRPSMF Attach. 3 *Daigle Decl.* ¶ 11 (*Daigle Decl.*).

[23]     Gallop qualifies this statement to admit that the District may believe that it "continues to reserve 20,000 GPD of capacity for the Plant" but denies that it is under any duty – contractual or otherwise – to do so since Gallop terminated the Agreement in December of 2013 via the Notice of Termination and further directs the Court to its response in PRDSAMF ¶ 33 regarding the reservation characterization.  PRDSAMF ¶ 34.

     Viewing the facts in the light most favorable to the District, the Court rejects the qualification. Given that the District agreed to accept up to 20,000 GPD from the Plant, and believes that the Agreement is still valid, one can infer that it does still reserve 20,000 GPD of the System's capacity for the Plant's exclusive use, as stated in the declaration of the District's manager.  *See Daigle Decl.* ¶ 12.

of the District's services, including potential users.  DSAMF ¶ 35; PRDSAMF ¶ 35.[24,25,26]

The District believes that median water usage in Greenville, Maine in the winter for a single-family residence is 82 GPD.  DSAMF ¶ 38; PRDSAMF ¶ 38.[27] Because outdoor water uses are rare in the winter, median water usage in winter correlates to the amount of wastewater discharged by a single-family residence to the System.  DSAMF ¶ 39; PRDSAMF ¶ 39.[28]  Because a single-family residence is assigned one user unit, the median 82 GPD discharged by a single-family residence

---

[24]    Gallop denies this statement, arguing that as a practical matter, the District only reserved 12,000 GPD for the District's exclusive use and stating that it was unaware of any time that the District asked it to reduce its capacity to accommodate potential users.  PRDSAMF ¶ 35.  It also notes that there was an almost 10% increase in the non-Plant District User Units, indicating there were not legitimate concerns over capacity.  *Id.*
       Viewing the facts in the light most favorable to the District, the Court rejects the denial and admits the District's statement.  As discussed above, *supra* note 22, because the District agreed to accept up to 20,000 GPD from the Plant, one can infer, as the District's expert does, that this capacity could not be allocated to other users.  *See Woodcock Dep.*, 90:8-17.

[25]    The District seeks to admit the statement: "The Plant was buying 20,000 GPD of the capacity of the System, and because of this the Plant had an obligation to pay the rates negotiated in the Agreement."  DSAMF ¶ 36.  Gallop denies this statement answering that its expert believes that the District reserved only 12,000 GPD for the Plant's exclusive use and that the District was obligated to look at actual capacity use to assess the rates.  PRDSAMF ¶ 36.
       The Court finds that this "fact" represents an argument regarding the interpretation and validity of a contract, a matter of law not properly presented in the statement of facts.  *See* D. ME. LOC. R. 56(b).

[26]    The District seeks to admit the statement: "Whether the Plant uses all of the capacity reserved for it does not affect the validity of the sewer rates charged to the Plant because it is the Plant's decision as to whether to use this capacity."  DSAMF ¶ 37.  Gallop denies this statement.  PRDSAMF ¶ 37.  *See supra* note 25.

[27]    Gallop denies this statement.  It alleges that Mr. Woodcock based his calculations on water consumption, not water discharge and states that its own expert believes that the average single-family residence discharges 300 GPD into the System.  PRDSAMF ¶ 38.  Viewing the facts in the light most favorable to the District, the Court rejects the denial and admits the statement.

[28]    *See supra* note 27.

27

equates to nearly 244 user units for the 20,000 GPD of capacity reserved for the Plant's use.  DSAMF ¶ 40; PRDSAMF ¶ 40.[29],[30]

The documents relating to the 1986 negotiations show that the District was concerned that adding the wastewater discharges from Greenville Steam Company to the System would increase the use of the treatment facility to 89% of capacity. DSAMF ¶ 54; PRDSAMF ¶ 54.[31]  The District has an obligation to maintain the System to maximize the potential use for all existing or future users.  DSAMF ¶ 55; PRDSAMF ¶ 55.  When use of a Maine sanitary district's system approaches 90% of capacity, this creates legitimate concerns that the Maine Department of Environmental Protection will order the sanitary district to pay for an expensive upgrade, expansion, or replacement of the system because of the limited remaining capacity.  DSAMF ¶ 56; PRDSAMF ¶ 56.  Infiltration and inflow of water from sources outside a sanitary treatment system reduce the capacity available for users of the system.  DSAMF ¶ 57; PRDSAMF ¶ 57.  Infiltration and inflow into the System is approximately 20% of capacity, which means that 34,000 GPD of the 170,000 GPD

---

[29]     *See supra* note 27.

[30]     The District seeks to admit the statement: "Because the Agreement allocated 20,000 GPD of capacity for the Plant's exclusive use, the rates in the Plant Rate Schedule are not unreasonable, arbitrary, or discriminatory.  DSAMF ¶ 41.  Gallop denies the statement.  The Court accepts the denial. *See supra* note 16.

[31]     Gallop qualifies this statement to admit that the District expressed concern that "if your [i.e., the Plant] daily is 20,000 gal/day, [the District] will be operating at 89% capacity which obviously leaves little room for future expansion in other areas," but to deny that "any daily discharge of less than 20,000 GPD from the Plant would push the System to 89% capacity."  PRDSAMF ¶ 54.

The Court rejects this qualification.  The Court interprets the District's statement only to show that the negotiations show concern that the discharge would increase the use of the facility to 89% capacity, not that the discharges from the System would in fact increase the use to 89% capacity.

design capacity is unavailable for users, leaving 136,000 GPD of useable capacity. DSAMF ¶ 58; PRDSAMF ¶ 58.[32]

### 5.     The Quality of the Plant's Discharges

Because the Plant's discharges lack microbes, they are nutrient deficient and can dilute and even kill the microbiology that is essential for the District's treatment facility to operate properly.  DSAMF ¶ 60; PRDSAMF ¶ 60.[33]  The potential adverse effects that the nutrient-deficient discharges from the Plant could have on the District's treatment facility were magnified by the presence of algaecide in these discharges and by the fact that the District could not buffer the discharges because the treatment facility is an indirect discharge system.  DSAMF ¶ 61; PRDSAMF ¶ 61.[34]  The District's concerns about the nature and quality of the Plant's discharges, including that the discharges were nutrient-deficient, contained algaecide, and could not be buffered by the District, are legitimate considerations in setting rates for the Plant, especially in light of the District's obligation to maintain the System to maximize the potential use for all customers; however, Gallop believes these factors

---

[32]     The District also seeks to admit the statement: "Because of the limited capacity remaining available for other users after 20,000 GPD of capacity was reserved for the Plant, the rates in the Plant Rate Schedule are not unreasonable, arbitrary, or discriminatory."  DSAMF ¶ 59.  The Court denies this statement.  *See supra* note 16.

[33]     Gallop seeks to qualify this statement by adding that "[t]his may be true in theory, but in reality, the District has never needed to take any new or different chemical or biological measures to the System in order to process wastewater discharged into the System by the Plant."  PRDSAMF ¶ 60. The Court finds this qualification already reflected in the record and therefore rejects the qualification here to avoid redundancy.  *See* PSMF ¶ 12.

[34]     *See supra* footnote 33.

29

should have been revisited after January 1987 given the lack of changes to the System to handle the Plant wastewater.  DSAMF ¶ 62; PRDSAMF ¶ 62.[35,36]

### 6.   The Plant's Peak Discharges

The table titled "Plant Operating Log Annual Wastewater Discharges to the District" shows that during the period from January 1, 1987 to April 1, 2011, the years 1997 and 2002, respectively, are the second and third lowest years of average GPD discharged to the System by the Plant.  DSAMF ¶ 42; PRDSAMF ¶ 42.  The Plant operated approximately 45 weeks a year because of spring and autumn shutdowns.  DSAMF ¶ 43; PRDSAMF ¶ 43.

The spreadsheet titled "Daily Waste Water Discharge Flow from Gallop Power Greenville to Moosehead Sanitation[sic] District" (the Daily Flow Spreadsheet) records the quantity of gallons discharged to the District each day during the period from November 12, 1987 through March 2011.  DSAMF ¶ 44; PRDSAMF ¶ 44.  The Daily Flow Spreadsheet also records days in which discharges to the District exceeded 12,000 gallons during the "Pre-Operating Period" from January 1, 1987 to November 11, 1987.  DSAMF ¶ 45; PRDSAMF ¶ 45.  The Daily Flow Spreadsheet shows that the Plant discharged more than 20,000 gallons into the System on 12 days.  DSAMF

---

[35]     Gallop seeks to qualify the statement to include: "While these were valid concerns before the Plant was connected to the System, the fact that the District thereafter never had to make any changes to the chemical or biological aspects of the System to handle the Plant wastewater means that this factor should have been revisited by the District after January of 1987."  PRDSAMF ¶ 62 (citing PSMF ¶ 12; *Quiram Aff.* ¶¶ 8, 9, 19).  The Court finds that the qualification is supported by the record but adds that the qualification is Gallop's position.

[36]     The District seeks to admit the following statement of fact: "Based on the District's concerns about the nature and quality of the Plant's discharges, the rates in the Plant Rate Schedule are not unreasonable, arbitrary, or discriminatory."  DSAMF ¶ 63.  The Court denies this statement.  *See supra* note 16.

¶ 46; PRDSAMF ¶ 46.[37]  The last date on which the Plant's daily discharge exceeded 20,000 gallons was March 1, 1995.  PRDSAMF ¶ 46.  The District assessed, and Greenville Steam paid, a penalty rate for every discharge in excess of 12,000 GPD per the terms of the Plant Rate Agreement.  PRDSAMF ¶ 46.  Of the 10,250 days between January 1, 1987, the date the Plant began keeping wastewater discharge records, and January 23, 2015, the date Gallop initiated this lawsuit, the Plant's daily discharge exceeded 20,000 GPD only 0.1% of the time.  PRDSAMF ¶ 46. The Daily Flow Spreadsheet shows that the Plant discharged between 12,000 and 19,999 gallons into the System on more than 115 days.  DSAMF ¶ 47; PRDSAMF ¶ 47.[38]  Of the 10,250 days between January 1, 1987, the date when the Plant began keeping wastewater discharge records and January 23, 2015, the date this lawsuit was initiated, the Plant's daily discharge fell between 12,000 GPD and 19,999 GPD only 1.1% of the time (115/10,250).  PRDSAMF ¶ 47.  The Daily Flow Spreadsheet shows that on

---

[37]     Gallop admits the allegations in ¶ 46 but seeks to qualify the statement, noting that the last date on which the Plant's daily discharge exceeded 20,000 gallons was March 1, 1995.  PRDSAMF ¶ 46 (citing *Stip.* Attach. 7 *Daily Flow Spreadsheet*).  Answering further, Gallop states that the District assessed, and Greenville Steam paid, a penalty rate for every discharge in excess of 12,000 GPD per the terms of the Plant Rate Agreement.  *Id.* (citing *id.* Attach. 7 *Penalty Records* (*Penalty Records*)).  Gallop also states that of the 10,250 days between January 1, 1987, the date when the Plant began keeping wastewater discharge records and January 23, 2015, the date this lawsuit was initiated, the Plant's daily discharge exceeded 20,000 GPD only 0.1% of the time.  *Id.* (citing *id.* Attach. 6 *Suppl. Graul Aff.* (*Suppl. Graul Aff.*)).

        The Court finds that the record supports the qualifications, which the Court included.

[38]     Gallop admits the allegations in ¶ 47 but seeks to qualify the statement, stating that the District assessed, and Greenville Steam paid, a penalty rate for every discharge in excess of 12,000 GPD per the terms of the Plant Rate Agreement.  *Id.* (citing *Penalty Records*).  Answering further, Gallop states that of the 10,250 days between January 1, 1987, the date when the Plant began keeping wastewater discharge records and January 23, 2015, the date this lawsuit was initiated, the Plant's daily discharge fell between 12,000 GPD and 19,999 GPD only 1.1% of the time (115/10,250).  *Id.* (citing *Suppl. Graul Aff.*).

        The Court finds that the record already reflects the first part of the qualification, *see supra* note 37, and finds that the record supports the second part of the qualification, which the Court included.

October 30, 1988, the Plant discharged 28,349 gallons into the System.  DSAMF ¶ 48;

PRDSAMF ¶ 48.[39]  The Daily Flow Spreadsheet shows that on March 1, 1995, the

Plant discharged 30,967 gallons into the System.  DSAMF ¶ 49; PRDSAMF ¶ 49.[40]

During cold startup of the Plant after an extended period of not operating,

wastewater discharges are high because there is a lot of water flow to the boiler and

draining operations; the volume of those increased discharges would vary from

startup to startup and would not necessarily be close to, or in excess of, 12,000 GPD.

DSAMF ¶ 50; PRDSAMF ¶ 50.[41]  Large flows to the System are part of the normal

operation of the Plant and cannot be predicted.  DSAMF ¶ 51; PRDSAMF ¶ 51.[42]  The

Plant's peak discharges to the System are an important consideration in determining

whether the rates in the Plant Rate Schedule are appropriate because the System

needs to have sufficient capacity available to handle the peak flows; however, Gallop

believes that once a user is connected and there is a mechanism in place to measure

---

[39]    Gallop repeats its qualification that it paid a penalty rate for every discharge in excess of 12,000 GPD.  *See supra* note 37.

[40]    *See supra* note 37

[41]    Gallop seeks to qualify this statement noting that cold Plant startups after extended idle periods would indeed result in increased wastewater discharges (which are a normal operating characteristic), but the volume of these increased discharges would vary from startup to startup and would not necessarily be close to, or in excess of, 12,000 GPD.  PRDSAMF ¶ 50 (citing *Suppl. Graul Aff*. ¶ 3).  The record supports the qualification, which the Court included.

[42]    Gallop seeks to qualify this statement by noting that "[w]hile it's true that large flows are part of normal Plant operations, the term 'large flows' as I used it in my deposition testimony did not always mean discharges in excess of 12,000 GPD . . . Often, 'large flow' could mean discharges considerably less than 12,000 GPD."  PRDSAMF ¶ 51 (citing *Suppl. Graul Aff*. ¶ 4).  The Court finds that this qualification is already reflected in the record.  *See supra* note 41.

actual flows, it is incumbent on the System to revisit those rates.  DSAMF ¶ 52; PRDSAMF ¶ 52.[43,44]

### 7.    The District's Vacant Property Protocol

Sewer charges continue to be assessed for any vacant property deemed to be accessible to the System.  DSAMF ¶ 69; PRDSAMF ¶ 69.  Upon request by the property owner, the District follows a detailed protocol for vacant properties and will reduce the sewer rates if the discharge pipe on the property is fitted with an expandable rubber plug and the District verifies upon a physical inspection of the property that the pipe is completely blocked; Gallop states that it was unaware of any such protocol until reviewing the District's statement and was unable to find any written reference to the protocol in any publicly-available District rules and regulations. DSAMF ¶ 70; PRDSAMF ¶ 70.[45]  If the conditions are met, the District assigns a vacant property rate, also known as a readiness-to-serve charge, that depends on the nature and use of the property.  DSAMF ¶ 71; PRDSAMF ¶ 71.[46]  If a property owner does not request a vacant property rate, plug the discharge line,

[43]     Gallop seeks to qualify this statement, conceding that the anticipated peak discharges are a relevant consideration, but noting that once a user is connected and there is a mechanism to measure actual flows, it is incumbent on the System to revisit those rates in light of actual usage data. PRDSAMF ¶ 52.  The Court finds that the record supports this qualification and included it.  However, it also notes that this is Gallop's position.

[44]     The District seeks to admit the statement: "Based on the Plant's peak discharges to the System, the rates in the Plant Rate Schedule are not unreasonable, arbitrary, or discriminatory." DSAMF ¶ 53.  The Court denies the statement.  *See supra* note 16.

[45]     Gallop qualifies this statement, admitting that this is the District's protocol but answering further that it was unaware that there was any such protocol until it reviewed the DSAMF, and that it has been unable to find any written reference to this "detailed protocol" in any publicly-available District rules and regulations, including the Sewer Use Ordinance and Maine regulations.  PRDSAMF ¶ 70 (citing *Suppl. Graul Aff.* ¶ 7).  The Court finds that this qualification is supported by the record and includes it.

[46]     *See supra* note 45.

and permit the District to verify that the pipe has been blocked, then the property owner continues to be responsible for paying the full sewer rates that have always been billed to it.  DSAMF ¶ 72; PRDSAMF ¶ 72.[47]   The District has always adhered to this protocol, and there are numerous examples of vacant properties in the District that have continued to be charged the full rate assigned to the property because the property owner did not request a reduced rate or follow the District's protocol. DSAMF ¶ 73; PRDSAMF ¶ 73.[48]   If the District were to charge Gallop a "readiness to serve charge," the District's Rule 30(b)(6) Designee assumes it would be "significantly less" than $30,000 per year.  PSMF ¶ 25; DRPSMF ¶ 25.

### 8. Communications Among the District, Gallop, and Greenville Steam

Gallop never notified the District that Gallop claimed to have removed a section of pipe in the Plant in December 2013 or that Gallop claimed to have disconnected the Plant from the System at that time.  DSAMF ¶ 74; PRDSAMF ¶ 74. The letter dated December 20, 2013 sent by Gallop's attorney to the District is silent as to whether the Plant's connection to the System remained in place or had been severed.  DSAMF ¶ 75; PRDSAMF ¶ 75.  The letter dated December 20, 2013 sent by Gallop's attorney to the District states, in part, that Gallop believes that "rates charged to [Gallop] by the [District], pursuant to the Agreement, and from its inception through termination, have been excessive, unlawful and in breach of the provisions of the Agreement."  DSAMF ¶ 76; PRDSAMF ¶ 76.

---

[47]      *See supra* note 45.
[48]      *See supra* note 45.

34

Danny Daigle, Manager of the District, sent a letter dated July 19, 2012 to Gallop stating, in part: "In regards to your outstanding balance owed to the Moosehead Sanitary District, the Trustees have instructed me to inquire as to your intentions on satisfying this debt. Since this account is equal to 15.4% of our budget we are in a situation where we need to possibly make some adjustments in our Operations and Maintenance for this year to reflect the loss of this income at this time. If you could give us some insight as to where you stand with this property and your intentions it would greatly help us to better proceed through the rest of this year." DSAMF ¶ 77; PRDSAMF ¶ 77. Gallop did not respond to this letter. DSAMF ¶ 78; PRDSAMF ¶ 78.[49]

The District believes that neither Greenville Steam nor Gallop ever requested that the 20,000 GPD capacity reserved for the Plant be reduced or changed in any way; however, Gallop claims that Greenville Steam's Plant Manager, Scott Hersey, approached the District requesting a reduction in the rates charged for the Plant's use because it was discharging amounts well below those contemplated in the Agreement. DSAMF ¶ 79; PRDSAMF ¶ 79.[50] The District believes that neither

---

[49]     Gallop seeks to qualify the statement by admitting that it did not formally respond to the July 19, 2012 letter but notes that the December 20, 2013 letter addressed the issues raised in the District's letter. PRDSAMF ¶ 78.

The Court rejects this qualification. The information contained in the December 2013 letter that Gallop seeks to add in its qualification is already in the record. *See Stip.* ¶ 32; DSAMF ¶ 75; PRDSAMF ¶ 75; DSAMF ¶ 76; PRDSAMF ¶ 76.

[50]     Gallop both objects to and denies the statement. It objects to the extent that the statement relies on the Declaration of John Whittier because Mr. Daigle testified during his deposition that Mr. Whittier did not have any recollection of the events that are the subject of this litigation. PRDSAMF ¶ 79. Citing caselaw, Gallop argues that Mr. Daigle's deposition testimony should control. *Id.*

The Court acknowledges Gallop's objection and strikes the reference to the Whittier Declaration in the record. However, the statement is still supported by the Daigle Declaration. *See Daigle Decl.* ¶ 34.

Greenville Steam nor Gallop ever requested prior to the December 20, 2013 letter sent by Gallop's attorney that the rates in the Plant Rate Schedule be reduced or changed in any way or that previous payments of sewer fees be refunded by the District; Gallop disagrees.  DSAMF ¶ 80; PRDSAMF ¶ 80.[51]   Neither Greenville Steam nor Gallop ever requested that the District assign a vacant property rate or readiness-to-serve charge to the Plant.  DSAMF ¶ 81; PRDSAMF ¶ 81.[52]  Since the December 20, 2013 letter sent by Gallop's attorney, the District has remained ready, willing, and able to accept wastewater discharges from the Plant.  DSAMF ¶ 82; PRDSAMF ¶ 82.

Prior to the letter dated December 20, 2013 sent by Gallop's attorney to the District, neither Greenville Steam nor Gallop had ever informed the District that sewer payments were being made under protest.  DSAMF ¶ 83; PRDSAMF ¶ 83.[53] The District claims that it did not know that Gallop believed that the rates charged

---

Gallop then denies the statement claiming that "[a]fter the Plant began operating, Greenville Steam's Plant Manager, Scott Hersey, approached both the District requesting a reduction in the rates charged for the Plant's use of the System because it was discharging amounts well below those contemplated in the Agreement; the District did not thereafter reduce the amounts owed under the Plant Rate Agreement."  PRDSAMF ¶ 79 (citing *id*. Attach. 8 *Hersey Aff.* ¶¶ 1-10).

After reviewing the record, the Court views the dispute as to whether Greenville Steam or Gallop requested that the 20,000 GPD capacity reserved for the Plant be reduced or changed in any way is a factual controversy.  It includes the statement but also includes Gallop's denial.  Further, the Court modifies the statements to show that it is each party's position.

[51]   *See supra* note 50.

[52]   Gallop both objects to and admits this statement.  The Court admits the statement, striking any reference to the Whittier Declaration.  *See supra* note 50.

[53]   Gallop both objects to and qualifies this statement.  *See supra* note 50 for the objection.  As for the qualification, Gallop adds that "[a]lthough Gallop sent a notice of termination to the District in the December 20, 2013 letter, it did cease making quarterly payments to the District in about April 2011 because it believed the District's charges were not fair and not commensurate with Gallop's use of the System at that time since the Plant was shut-down and discharge to the System was effectively zero."  PRSDSAMF ¶ 83.

The qualification is not responsive to the statement.  The District states that neither Greenville Steam nor Gallop informed them the payments were under protest.  Gallop seeks to qualify the statement with information about the non-payments.  The Court rejects this qualification.

to the Plant were excessive or unlawful until the District received a letter dated December 20, 2013 from the attorney for Gallop; Gallop claims that Greenville Steam's Plant Manager requested a rate reduction.  DSAMF ¶ 84; PRDSAMF ¶ 84.[54]

In setting its annual budgets and in making decisions about incurring and paying for operational and maintenance costs since 1987, the District relied on receiving the revenue from the sewer charges assessed to the Plant.  DSAMF ¶ 85; PRDSAMF ¶ 85.[55]   In setting its annual budgets and in making decisions about incurring and paying for operational and maintenance costs since 1987, the District relied on the fact that neither Greenville Steam nor Gallop ever requested a rate reduction, refund of sewer fees previously paid, reduction in the amount of the capacity reserved to the Plant, or a vacant property rate or readiness-to-serve charge; however, Gallop claims that it did request a rate reduction.  DSAMF ¶ 86; PRDSAMF ¶ 86.[56]

---

[54]     *See supra* note 50.

[55]     Gallop objects to this statement on the ground that it is not "material."  PRDSAMF ¶ 85.  It argues that the "[t]he fact that the District relied on the revenue received from Greenville Steam and then Gallop is utterly irrelevant to the instance case and should play no part in an analysis of whether the Plant Rate Agreement violated 38 M.R.S. § 1202."  *Id.*

The Court disagrees. The District claims that the affirmative defenses of waiver and estoppel bar the complaint.  *Def.'s Opp'n* at 19-22.  "In order [ ] to avoid summary judgment on the basis of its affirmative defenses of waiver and equitable estoppel, [a party] must demonstrate that the summary judgment record contains disputed issues of fact to generate these defenses."  *See Kirkham v. Hansen,* 583 A.2d 1026, 1027 (Me. 1990).  Under Maine law, to prove waiver and estoppel, a party is required to show that it relied on the misleading conduct to its detriment.  *Id.* (citing *Blue Star Corp. v. CKF Props., LLC,* 2009 ME 101, ¶ 26, 980 A.2d 1270).  Therefore, a dispute over the fact that the District would experience severe financial hardship if it had to refund 20 years of payments "has the potential to change the outcome of the suit."  *See Tropigas,* 637 F.3d at 56 (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern,* 605 F.3d 1, 5 (1st Cir. 2010)).  The Court overrules the objection and admits the statement.

[56]     *See supra* note 55 regarding the objection.  Gallop further denies this statement stating that, "[i]n fact, Greenville Steam did request a rate reduction/rebate/refund."  PRDSAMF ¶ 86.  The Court finds that there is a factual dispute on this issue and therefore admits the statement, but also includes the denial.  *See supra* note 50.

If the District had known that the Plant would not be paying the rates in the Plant Rate Schedule or would be requesting payment refunds years after the fact, the District would have changed its annual budgets and would not have incurred certain operational and maintenance costs that it did incur.  DSAMF ¶ 87; PRDSAMF ¶ 87.[57] If the District is ordered to refund payments made by Greenville Steam and Gallop during the 20 years prior to the filing of this lawsuit, this would create a severe financial hardship for the District. DSAMF ¶ 88; PRDSAMF ¶ 88.[58]

It is the District's position that based on the rates in the Plant Rate Schedule, Gallop owes to the District the following amounts as of January 31, 2016: $142,286.76 for user fees, $34,968.76 of accrued interest, and $144.87 for lien fees, for a total due of $177,400.39.  DSAMF ¶ 89; PRDSAMF ¶ 89.[59]

## III.   THE PARTIES' POSITIONS

### A.   Gallop's Motion for Partial Summary Judgment

Gallop moves for partial summary judgment as to liability on all causes of action it asserted against the District and summary judgment as to both liability and

---

[57]   *See supra* note 55. The statement is admitted.
[58]   *See supra* note 55. The statement is admitted.
[59]   Gallop qualifies this statement:

> Although the amounts listed in [DSAMF] may constitute what the District believes to be due it, assuming that the Agreement is enforceable pursuant to its terms and was not terminated in December of 2013 when Gallop issued the Notice of Termination, Gallop does not believe that any amounts are owed to the District for all of the reasons set forth in Gallop's Motion for Partial Summary Judgment and related documents.

PRDSAMF ¶ 89.
       The Court agrees that the amounts owed depend on whether the Agreement is enforceable pursuant to its terms and whether it was terminated in December of 2013, which are legal arguments. Adhering to summary judgment praxis, the Court retains the statement as written by the District, the nonmovant, but the Court modifies the statement to indicate that it represents the District's position. *See Gillen*, 283 F.3d at 17.

38

damages on all of the causes of action asserted in the District's counterclaim.  *Pl.'s Mot.* at 1.

First, Gallop argues that the rates charged to Gallop by the District are not uniform as required by 38 M.R.S. § 1202 and the Agreement.  *Id.* at 12.  Gallop indicates that under Maine statutory law, the rates in sanitary districts, "shall be uniform within such district, whenever the cost to the district of installation and maintenance of sewers or their appurtenances and the cost of service is substantially similar."  *Id.* (citing 38 M.R.S. § 1202).  Citing Maine caselaw, Gallop explains that "absolute uniformity" is not required, but rates "cannot be discriminatory unless there is a cost based reason for discrimination."  *Id.* at 13.  It also states that the "*sine qua non* of municipal rate setting for water and sewer utilities are the concepts of fairness, equality and uniformity."  *Id.* at 13-14 (collecting cases).

Gallop claims that "[t]he uniformity principle of Section 1202 is expressly incorporated into and governs the rates set under the Agreement" as evidenced by the provision in the Agreement that states that the Plant Rate Schedule "will be amended from time to time by [the District] and shall be binding upon [Greenville Steam] subject to the terms of 38 M.R.S.A. § 1202."  *Id.* at 13.

Based on this legal framework, Gallop alleges that:

the undisputed material facts demonstrate that the rates charged to the Plant by the District are wholly arbitrary, as demonstrated by the following: (a) the District has no explanation for how it arrived at the figures and charges comprising the Agreement's Rate Schedule in 1986 or thereafter; and (b) the amounts charged the owners of the Plant, Gallop and Greenville Steam, have never, since the inception of the Agreement almost thirty (30) years ago, had any relation whatsoever to rates charged to other customers, or to the proportion of the District's

available capacity utilized by Greenville Steam or Gallop; or to the total
utilization of that capacity attributable to the Plant.

*Id.* at 15.  Therefore, Gallop argues, it is entitled to summary judgment as to Counts

I, II, and III, to the extent that Count III seeks a declaratory judgment that the

District violated section 1202.  *Id.*

Gallop elaborates on its argument, beginning "with two core, undisputed,

material facts."  *Id.* at 16.  First, Gallop claims that it is undisputed that the

wastewater discharged by the Plant into the System did not require special treatment

by the District.  *Id.*  Specifically, Gallop states that the District did not need to expand

the capacity of the System to deal with the volume of wastewater and it did not need

to take any different steps to deal with the nature of the Plant's wastewater.  *Id.*

Gallop argues that therefore "the only permissible basis for the District to charge

Greenville Steam and Gallop more than other customers is volume" and although

section 1202 permits differences in charges based on volume, "it requires uniformity

in the rate per gallon of effluent treatment because there is no variation in cost to

treat the Plant's effluent as compared with other customers' effluent, and there is no

capacity cost to treating the Plant's effluent."  *Id.* at 17.

Second, Gallop points out the fact that "the District has no idea how rates

historically charged to the Plant were determined or set."  *Id.* at 18.  It goes on to

claim that "there was no correlation whatsoever between the rates imposed on

Greenville Steam and Gallop in the Agreement, the rates charged to other customers,

or the cost of serving Greenville Steam and Gallop."  *Id.* at 18-19.  Gallop alleges that,

"[a]s a result, Greenville Steam and Gallop have been paying a non-uniform and

grossly disproportionate share of the District revenues and cost of operations, regardless of what metrics are used." *Id.* at 19.   Gallop includes a number of demonstratives in support of this claim. *Id.* at 19-22.

Next, Gallop analogizes its case to *Concord Steam Corporation v. City of Concord*, 519 A.2d 266 (N.H. 1986).   *Id.* at 22.   In that case, the City calculated Concord Steam's sewer rent based on 75% of the amount of water Concord Steam purchased from the City (the amount of water flowing into the plant) when only "roughly 15%" of that volume outflowed to the sewer system. *Id.* at 23 (citing *Concord Steam*, 128 N.H. at 269-70).   The New Hampshire Court held that this was a "substantial disparity" that violated New Hampshire law. *Id.* (citing *Concord Steam*, 128 N.H. at 269-70).   Gallop states that here, like *Concord Stream*, there are "substantial disparities" between "(a) Gallop's share of District revenues paid by it and (b) its share of total System capacity and/or utilization." *Id.*   Gallop also claims that there is a "gross disparity and unfairness" between the number of User Units assigned to the Plant and the Plant's actual volume of discharge. *Id.* at 25-26 (citing *Ridgway Twp. Mun. Auth. v. Exotic Metals, Inc.*, 491 A.2d 311 (Pa. Commw. Ct. 1985)).

In response to the District's affirmative defenses of waiver and estoppel, Gallop argues that "principles of waiver and estoppel have no place in situations such as this where the Legislature has made a public policy determination designed to protect the public as a whole, namely an affirmative requirement of uniformity of billing by water and sewer authorities, such as the District." *Id.* at 27.   Gallop states: "A statutory

right conferred on a private party, but affecting a public interest, may not be waived or released if such waiver or release contravenes the statutory policy." *Id.* at 27-28 (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704-05 (1945)). Gallop claims that uniformity in water and sewer rates "is plainly an issue of public interest" and so neither Gallop, nor Greenville, could waive its protections. *Id.* at 28.

Gallop also contends that its Notice of Termination ended the agreement as of December 20, 2013. *Id.* at 28. Citing Maine caselaw, Gallop states that "contracts without a definite term are terminable at will." *Id.* at 28-29 (collecting cases). It goes on to argue that because "the Agreement has no stated term and no express mechanism for termination," it is terminable at will. *Id.* at 29. Therefore, Gallop argues, it is entitled to summary judgment as to Count III to the extent it seeks a determination that the Agreement has been terminated as of that date and that any Liens of Certificates filed by the District for services or benefits provided after that date are null, void, unenforceable, and discharged. *Id.* It also seeks summary judgment based on these facts on Count I of the Counterclaim to the extent that the District claims Gallop has breached an obligation allegedly due under the Agreement after December 20, 2013. *Id.*

Finally, Gallop alleges that the District has provided no services or benefits to Gallop after December 20, 2013 because Gallop terminated the Agreement on that date and "severed the connection between the Plant and the System that same month." *Id.* at 30. Therefore, Gallop claims it is entitled to summary judgment on Counts II and III of the counterclaim for quantum meruit and unjust enrichment. *Id.*

42

### B.    The District's Opposition

In its opposition, the District first notes that "[a] pivotal factor in analyzing the validity of sewer rates is that sanitary districts cannot, as a practical matter, measure wastewater discharges . . . Accordingly, courts recognize that a precise mathematical relationship between wastewater discharges and sewer rates is not feasible." *Def.'s Opp'n* at 2 (collecting cases).  The District goes on to say that because "rate setting is an inexact science, courts accord sanitary districts considerable discretion in setting rates." *Id.*  The user bears the burden of proving the rates are unlawful.  *Id.*

Next, the District argues that the Agreement is enforceable and the rates set forth in the Agreement govern the discharge of wastewater by the Plant to the District.  *Id.* at 2-3.  The District claims that Greenville Steam "freely entered into the Agreement."  *Id.* at 3.  The District argues that because the contract was freely entered into by both parties, "it must be construed and enforced using ordinary principles of contract law."  *Id.* at 4.  The District states that the Maine Legislature has authorized sanitary districts to enter into these types of contracts, *id.* (citing 38 M.R.S. § 1157), and that courts routinely enforce the agreed-upon terms of these contracts.  *Id.* (collecting cases).  It explains that the reason courts enforce these contractual terms is because "the relationship of a sanitary district to users 'beyond its limits arises only through contract and the reasonableness or unreasonableness of its charges for access to its system is not subject to judicial review.'"  *Id.* at 5 (quoting *Payson San. Dist. of Gila Cty. v. Zimmerman*, 581 P.2d 1148, 1151 (Ariz. Ct. App. 1978)).

The District opposes Greenville Steam's contention that it was not free to enter into the contract. *Id.* It alleges that the Sewer Use Ordinance did not require Greenville Steam to hook up to the System, that Greenville Steam had other options for handling the wastewater, that there were back-and-forth negotiations between the parties, represented by attorneys, and that Gallop assumed the contractual obligations when it purchased the Plant and Greenville Steam's interest in the Agreement. *Id.*

The District also opposes Gallop's assertion that the rates are arbitrary because of the District's lack of knowledge about how the rates are set, and claims that the Agreement is enforceable by its terms regardless of how the parties set the rates. *Id.* Moreover, the District states that "an extensive documentary record exists" and that "Greenville Steam and the District exchanged detailed information concerning the quantity and quality of the Plant's industrial wastewater discharge and the effect those discharges would have on the System." *Id.* at 6. It argues that "[t]hese factors justify the rates in the Plant Rate Schedule." *Id.*

Next, in response to Gallop's argument that the Plant Rate Schedule fails to meet the uniformity requirement of section 1202, the District claims that 38 M.R.S. § 1202 does not apply. *Id.* at 7. It states that the uniformity requirement does not apply to property owners outside the district and that Greenville Steam, before entering into the Agreement, fell into this category. *Id.* Further, the District contends that section 1202's uniformity requirement was not incorporated into the Plant Rate Schedule. *Id.* at 8. It claims that the plain meaning supports the

44

interpretation that section 1202 only applies if the District amends the Plant Rate Schedule. *Id.* at 8. The District maintains that because it has never amended the schedule, section 1202 does not apply. *Id.* It further indicates that the contract negotiations between the parties support this interpretation of the Agreement. *Id.*

The District also argues that even assuming section 1202's uniformity standard does apply to the Plant Rate Schedule, "Gallop has not met its burden of proving as a matter of law that the rates Greenville Steam promised to pay – and that Gallop willingly assumed – fail to comply with the statute." *Id.* at 9. The District explains that "[b]ecause sanitary districts cannot meter wastewater discharges, courts hold that uniformity does not demand either a precise mathematical relationship or absolute uniformity." *Id.* It states that sewer rates are uniform if they are not unreasonable, arbitrary, or discriminatory. *Id.* It goes on to say that "caselaw makes clear that there is no right or wrong way to set sewer rates" and that "a myriad of rate structures exist." *Id.* at 10.

Under this legal framework, the District argues that the Plant Rate Schedule is not unreasonable, arbitrary, or discriminatory because it relied on legitimate factors. *Id.* at 11. Specifically, the District points to facts that it claims show that it reserved 20,000 GPD of capacity to the Plant, the Plant's peak discharge dwarfs the average discharge, the allocation of the 20,000 GPD to the Plant used up most of the Systems remaining capacity, the Plant's discharges are qualitatively different from those of other users, and the Plant is in a class of its own. *Id.* at 11-17.

45

The District opposes Gallop's contention that the user unit rate structure violates the uniformity standard. *Id.* at 17. First, it argues that the validity of the General Rate Structure is not at issue in this case. *Id.* Next, it argues that a flat-fee rate structure employing user units is not based on actual GPD discharges, but by use and the volume allocated to that type of use. *Id.* at 18. It then disputes Gallop's analogy to *Ridgway*, stating that the case "dealt with water rates, which unlike sewer discharges, can be metered." *Id.* It also opposes Gallop's analogy to *Concord Steam*, claiming that the facts are not similar to the present case. *Id.* at 19.

Next, the District addresses its waiver and estoppel defenses. *Id.* It states that under Maine law waiver is defined as "a voluntary or intentional relinquishment of a known right and may be inferred from the acts of the waiving party intended to abandon its rights." *Id.* at 20 (citing *Blue Star Corp. v. CKF Props. LLC*, 2009 ME 101, ¶ 26, 980 A.2d 1270). It also states that estoppel "focuses on misleading conduct rather than intention," *id.* (citing *Chalet Susse Int'l, Inc. v. Mobil Oil Corp.*, 597 A.2d 1350, 1352 (Me. 1991)), and that "if a party relies on misleading conduct to its detriment, estoppel precludes the opposing party from asserting a right it may otherwise have." *Id.* (citing *Blue Star*, 2009 ME 101, ¶ 27, 980 A.2d 1270).

To support its claim that waiver and estoppel apply to Gallop, the District points to the facts that Gallop purchased the Plant, willingly assumed Greenville Steam's interest in the Agreement, performed its obligations until the attempted termination, never informed the District that its payments were made under protest, never sought a reduction of the rates, never asked for a refund, and did not request a

46

vacant property rate or readiness-to-serve charge.  *Id.*  It also disagrees that waiver does not apply to section 1202, stating that parties can waive statutory rights, and even fundamental constitutional rights.  *Id.* at 21 (collecting cases).

Next, the District argues that Gallop cannot unilaterally terminate the Agreement because it is compelled to connect to the System.  *Id.* at 22.  It states that courts must analyze the parties' intent to determine the validity of the termination notice.  *Id.*  It points out that the Plant's private sewer comes within 200 feet of the District and actually ties into that sewer and therefore, the Plant's buildings are accessible within the meaning the Sewer Use Ordinance, which was incorporated into the Agreement.  *Id.* at 23-24.  It claims, then, that under the Ordinance and 38 M.R.S. § 1160, Greenville Steam must hook up to the System and cannot "unilaterally opt out of its compulsory obligations to the District."  *Id.* at 24.

The District explains that it "is not arguing that the Plant Rate Schedule is of indefinite duration or perpetual."  *Id.*  It points out that under the Ordinance, the Plant has a right to "invoke the District's vacant property protocol to request a rate reduction."  *Id.* at 25.  It does so by installing a rubber plug to cut off any flow, after which the District physically inspects the property.  *Id.*  When these conditions are satisfied, the District assigns a "readiness to serve charge."  *Id.*  Otherwise, the property owner is required to continue to pay the full sewer charges for the property.  *Id.* at 26.  The District claims that Gallop never requested a reduced rate or notified the District that it removed a pipe to make the Plant inaccessible to the System.  *Id.*

at 26-27.  It maintains that the Plant is still accessible because its private sewer remains in place.  *Id.* at 27.

Finally, the District argues that Gallop is not entitled to summary judgment on the counterclaim.  As for Count I, the District alleges that "[b]ecause the Agreement is enforceable, does not violate section 1202 (to the extent this statute even applies), and has not terminated" it is entitled to all sums due under the Plant Rate Schedule.  *Id.* at 28.  As for Counts II and III, the District argues that because it "continues to reserve the 20,000 GPD allocated to the Plant for its exclusive use and remains ready, willing, and able to accept wastewater from Gallop" it provides a valuable service and is entitled to quantum meruit.  *Id.*  Additionally, it argues, that because Gallop "can resume operations at the Plant if it so chooses and because access to these services enhances the value of the Plant" there is unjust enrichment if Gallop does not pay.  *Id.*

### C.  Gallop's Reply

Gallop disagrees with the District that section 1202 does not apply.  First, it argues that the *Payson* case on which the District relies represents a minority view. *Pl.'s Reply* at 1.  It maintains instead that "any rate imposed by a utility, including a rate imposed by contract on a non-resident, is open to judicial review."  *Id.* at 2 (collecting cases).  Gallop views as instructive *Handy v. City of Rutland*, 598 A.2d 114 (Vt. 1990), in which non-residents challenged a one-time hookup fee on the grounds that it was inequitable and discriminatory.  *Id.*  Gallop says that "[a]fter holding the terms of any contracts between municipalities and non-resident users that set sewer

48

rates 'are enforceable only if the rates are in compliance with applicable law,' the Vermont Court ruled that 'the reasonableness of . . . extraterritorial sewer rates is an appropriate issue for judicial review.'" *Id.* (citing *Handy*, 598 A.2d at 118).  Gallop argues that "[t]he instant matter is analogous to *Handy*" and that consistent with *Handy* and the "overwhelming majority of cases from other jurisdictions," *id.* at 3 (citing *Platt v. Town of Torrey*, 949 P.2d 325, 331 (Utah 1997)), "the fairness of the Plant Rate Schedule is properly before this Court" and the fact that the terms were negotiated does not remove them from the uniformity requirements of section 1202. *Id.*

Gallop also cites documents from the negotiations, submitting that these records show that the District knew that the principles of fairness and reasonableness would apply to the contractual relationship of the parties.  *Id.* at 3-4.  Additionally, Gallop disagrees that the plain language of the contract suggests that section 1202 only applies to the amended rate schedules and claims that the plain language suggests that section 1202 applies to every aspect of the Agreement.  *Id.* at 4-5.

Finally, Gallop argues that the factors relied on by the District to show the rates are reasonable are irrelevant.  *Id.* at 6.  Gallop claims that "[w]hat is material is the (undisputed) fact that the District knew that servicing the Plant had no impact on the District's ability to process other users' effluent and the District knew that the Plant virtually never used the full capacity allocated." *Id.*  Additionally Gallop argues that the "peak discharges were almost never above 12,000 GPD (never mind 20,000 GPD), and when they were, the System easily handled those flows." *Id.* at 7.  It also

49

maintains that the "unique status" of the Plant "did not require the District to do anything different, hydraulically, chemically, or biologically, to process the Plant wastewater." *Id.* Gallop concludes by claiming that "the undisputed material facts reflect that the District was obligated to periodically assess whether the Plant Rate Schedule satisfied the requirements of § 1202." *Id.*

## IV.   STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then

50

"views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## V.   DISCUSSION

As this is a diversity case, the Court is bound to apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Both parties agree that Maine law governs[60] and the Court accepts this concession. *See Moores v. Greenberg,* 834 F.2d 1105, 1107 n.2 (1st Cir. 1987) ("Where the parties agree what substantive law controls in a diversity case, we can-and ordinarily should-accept such a concession") (citing *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 853 n.3 (1st Cir. 1987)). Additionally, since no Maine court has spoken to certain of the pending issues, it is the Court's "duty to vaticinate how the state's highest tribunal would resolve matters." *Id.* at 1107. "In undertaking this forecast, the court must look to relevant, i.e., analogous, state court decisions, and may assay sister state adjudications of the issue. In the process, we may reasonably assume that [the state court] will follow the rule that appears to best effectuate relevant policies." *Id.* (internal citations omitted).

---

[60]   *Pl.'s Mot.* at 28; *Def.'s Opp'n* at 4 n.9.

### A.    Count I: Breach of Contract

Although both parties agree that there was a valid contract between them, Gallop suggests that the contract "was not the result of a negotiation between parties with equal bargaining power." *Pl.'s Mot.* at 27 n.25; *Pl.'s Reply* at 3 n.3.  By contrast, the District argues that both parties freely entered into the Agreement.  *Def.'s Opp'n* at 4.  As a threshold matter, the Court must determine whether the Agreement is enforceable.   Then, the Court will analyze whether section 1202 applies to the Agreement.   Finally, the Court will discuss whether the rates established in the Agreement are subject to judicial review.

### 1.    Enforceable Contract

As a general matter, a sanitary district is under no obligation to furnish service outside its boundaries.  *Fairway Manor, Inc. v. Bd. Of Comm'rs of Summit Cty.*, 521 N.E.2d 818, 822 (Ohio 1988); *Schlarb v. N. Suburban Sanitation Dist.*, 357 P.2d 647 (Co. 1960); *Payson Sanitary Dist. Of Gila Cty. v. Zimmerman*, 581 P.2d 1148, 1151 (Ariz. Ct. App. 1978) (citing *City of Phoenix v. Kasun*, 97 P.2d 210 (Ariz. 1939)); *Davisworth v. City of Lexington*, 224 S.W.2d 649 (Ky. Ct. App. 1949); *see also* S. Stevenson, ANTIEAU ON LOCAL GOV'T LAW, § 83.04(3) (2d ed. 2008). The District argues that because the Plant was "outside its boundaries" before entering the Agreement, there was no obligation to furnish (or receive) service, and therefore parties freely entered into the Agreement.

The Court agrees that before entering into the Agreement, the Plant was located outside the District.  The District's Sewer Use Ordinance requires property

owners to hook up to the System only if their buildings are "accessible" to a sewer or drain of the District.  *Ordinance*, art. II, § 2.  A building is deemed to be "accessible" if it is located within 200 feet of a District sewer or if a private sewer directly or indirectly connected to the building or carrying industrial waste from the building comes within 200 feet of a District sewer.  *Id.*; *see* 38 M.R.S. § 1160.  When Greenville Steam submitted its industrial sewer connection application, it did not fall into either category.  DSAMF ¶ 16; PRDSAMF ¶ 16.  It was not until after submitting the application and entering into the Agreement that Greenville Steam built the sewer that connected the Plant to the System.  DSAMF ¶ 17; PRDSAMF ¶ 17.

The District claims that because Greenville Steam did not have any legal obligation to connect to the System, it could have explored other options to dispose of its industrial wastewater, including obtaining a permit to process the wastewater on the Plant property, DSAMF ¶ 20, and therefore it freely entered into the Agreement. Gallop disputes this fact, claiming that small power plants, like the Plant, rarely have their own treatment facilities, PRDSAMF ¶ 20.  However, viewing the facts in the light most favorable to the District, the Court finds that Greenville Steam had other options but chose to enter into the Agreement with the District.

Gallop, however, argues that there was not truly a choice because of the unequal bargaining power between the parties.  In support of its claim, Gallop asserts that (a) the District was the only option for wastewater treatment; (b) it had unilateral ability to approve Greenville Steam's application, which approval would not be granted until a billing rate was set; and (c) Greenville Steam was in a hurry

to get a System connection so it could get Plant up and running. *Pl.'s Mot.* at 27 n.25; *Pl.'s Reply* at 3 n.3.

Gallop, in its use of the term "unequal bargaining power," appears to be asserting a claim of procedural unconscionability. Unconscionability can be considered through two lenses: procedural and substantive. *Jay Cashman, Inc. v. Portland Pipe Line Corp.*, 559 F. Supp. 2d 85, 108 (D. Me. 2008). Procedural unconscionability generally refers to the exploitation of unequal bargaining power between the parties. *Cashman*, 559 F. Supp. 2d at 108 (citing *Am. Airlines v. Wolens*, 513 U.S. 219, 249 (1995) ("[P]rocedural unconscionability is broadly conceived to encompass not only the employment of sharp practices and the use of fine print and convoluted language, but a lack of understanding and an inequality of bargaining power")). The measure of unconscionability is taken at the time of execution of the contract. *Id.*

Under this legal framework, Gallop's claim that its predecessor was not free to enter into the contract must fail. There are no facts to suggest that the District used "sharp practices," "fine print," or "convoluted language," or that Greenville Steam lacked understanding. *See Am. Airlines*, 513 U.S. at 249. Greenville Steam, a limited partnership, was a sophisticated party. *See L.L. Bean, Inc. v. Metro-Autospan, Inc.*, No. CV-88-1362, 1989 Me. Super. LEXIS 250, at *11 (Me. Super. Ct. Dec. 11, 1989). Moreover, there are no facts to suggest that Greenville Steam was not afforded an opportunity to review the Agreement. To the contrary, the record reveals extensive back and forth negotiations. *See supra* Section II.B.1. In fact,

54

Greenville Steam's attorney reviewed the Agreement and proposed changes.  DSAMF ¶ 10; PRSAMF ¶ 10.  Additionally, there are no facts to show that Greenville Steam was unable to walk away from the deal.  Although Gallop claims that time was of the essence and the District was the only place for wastewater treatment, as discussed above, the facts, viewed in a light most favorable to the District, suggest that Greenville Steam could have sought a permit to process wastewater on its own property.  The Court finds that the parties freely entered into the Agreement and concludes that the Agreement is enforceable.

### 2.    Incorporation of Section 1202

The Court next determines whether the uniformity requirement in section 1202 applies to the rates in the Agreement.  The Agreement states in pertinent part:

> The present Rate Schedule is attached hereto (EXHIBIT A) and is a part of this Agreement.  Said Rate Schedule will be amended from time to time by the MOOSEHEAD SANITARY DISTRICT and shall be binding upon the GREENVILLE STEAM COMPANY subject to the terms of 38 M.R.S.A. Sec. 1202.

*Compl.* Attach. 1 *Agreement* § I (*Agreement*).   The parties offer competing interpretations of this clause.  The District believes that the clause incorporates section 1202 only insofar as it applies to any amended Rate Schedules.  Gallop, however believes that the clause incorporates section 1202 so that it applies to the entire Agreement, including the rate schedule originally adopted.

Whether a contract or contract term or phrase is unambiguous presents a question of law.  *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir. 1996).  At first glance, it may seem the contract is ambiguous (although neither the District nor Gallop

subscribes to that view).[61]   On further examination, however, that is not the case. Under Maine law, a contract need not "negate every possible construction of its terms in order to be unambiguous." *Waxler v. Waxler*, 458 A.2d 1219, 1224 (Me. 1983).   Nor is a contract ambiguous "merely because a party to it . . . disputes an interpretation that is logically compelled." *Blackie*, 75 F.3d at 721.   A contract is ambiguous only when its terms, fairly construed, yield more than one reasonable interpretation. *Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004).

In this case, Gallop's interpretation of the provision is unreasonable.   A contract ordinarily should be interpreted so as to give force to all of its provisions. *Blackie*, 75 F.3d at 722; *Acadia Ins. Co. v. Buck Constr. Co.*, 2000 ME 154, ¶ 9, 756 A.2d 515.   It follows that an inquiring court should, wherever possible, avoid an interpretation that renders a particular word, clause, or phrase meaningless or relegates it to the category of mere surplusage. *Acadia*, 2000 ME 154, ¶ 9, 756 A.2d 515; *Crowe*, 365 F.3d at 97.   Gallop's interpretation would contravene this rule.   It interprets the statement to read that the Rate Schedule will be amended from time to time, and also that the Rate Schedule shall be binding on Greenville Steam subject to the terms of 38 M.R.S. § 1202.   However, the sentence just before the contested clause states "[t]he present Rate Schedule is attached hereto and is a part of this Agreement." *Agreement* § I.   The language of this sentence already makes clear that the Rate Schedule is binding on the parties; it is a part of the Agreement.   Therefore, to avoid an interpretation that renders the prior sentence meaningless or "relegates

---

[61] *Def.'s Opp'n* at 8; *Pl.'s Reply* at 4.

it to mere surplusage," the Court interprets the contested clause to mean that when the schedule is amended, it will be binding subject to the terms of 38 M.R.S. § 1202. *See Acadia*, 2000 ME 154, ¶ 9, 756 A.2d 515; *Crowe*, 365 F.3d at 97.

Moreover, when interpreting a contract, the Court examines the document as a whole. *See Baybutt Constr. Corp. v. Commercial Union Ins. Co.*, 455 A.2d 914, 921 (Me. 1983) (overruled on other grounds).  In the very next section, the Agreement states: "The present Sewer Use Ordinance is attached hereto (EXHIBIT B) and is a part of this Agreement and its terms as amended from time to time are binding upon Greenville Steam Company." *Agreement* § II.  In this clause, the language "binding upon Greenville Steam Company" clearly applies only to the amended ordinances. This suggests that the parties had the same intentions for the contested clause in the preceding section, which uses the same language and has a similar construction. Therefore, the Court finds that the express incorporation of section 1202 only applies to any amended Rate Schedules.

Notwithstanding this interpretation, the Court finds that section 1202's uniformity requirement applies to the rates established in the Agreement.  The District is a quasi-municipal corporation.  As such, it is a creature of statute and only has the powers authorized by statute expressly or by necessary implication.  *Pike Indus., Inc. v. City of Westbrook*, 2012 ME 78, ¶ 17, 45 A.3d 707; *Phillips Vill. Corp. v. Phillips Water Co.*, 71 A. 474, 475 (Me. 1908).  Therefore, to analyze the extent of the District's power to contract, the Court must closely examine the statute that created the District.

Under the Maine Sanitary District Enabling Act, "[a]ny sanitary district formed under this chapter is authorized to contract with persons, corporations, districts and other municipalities, both inside and outside the boundaries of the district . . . to provide for disposal of sewage and commercial and industrial waste and storm and surface water through the district's system."  38 M.R.S. § 1157.  This provision, however, does not provide any guidance as to the terms or substance of those contracts.

Section 1202 of the Act does discuss rates in general.  It states:

All persons, firms and corporations, whether public, private or municipal, shall pay to the treasurer of any district formed under this chapter the rates, tolls, rents, entrance charges and other lawful charges established by the trustees for the sewer or drainage service used or available with respect to their real estate, which rates shall include rates for such district's readiness to serve charged against owners of real estate, abutting on or accessible to, sewers or drains of the district, but not actually connected thereto, whether or not such real estate is improved.

Rates, tolls, rents and entrance charges shall be uniform within such district, whenever the cost to the district of installation and maintenance of sewers or their appurtenances and the cost of service is substantially uniform; but nothing shall preclude the district, from establishing a higher rate, toll, rent or entrance charge than the regular rates, tolls, rents and entrance charges in sections where, for any reason, the cost to the district of construction and maintenance, or the cost of service, exceeds the average, but such higher rates, tolls, rents and entrance charges shall be uniform throughout the sections where they apply.

38 M.R.S. § 1202.  Interestingly, this same section also states that "*[n]otwithstanding any other provision of law*, districts which share, supply, or contract for services *with another district* shall establish rates, tolls, rents, and entrance charges *mutually agreeable* to the trustees of each participating district."  *Id.* (emphasis added).  The

58

Court interprets this provision to mean that notwithstanding any other provision of law, such as section 1202's uniformity requirement, districts which contract with other districts are free to establish "mutually agreeable" rates. There is no such provision for when a district contracts with persons or corporations. The omission of this language suggests that the Maine Legislature intended for the uniformity requirement established in section 1202 to apply to the rates established in contracts with non-districts; otherwise, it would have expressly stated that it does not apply, as it did for contracts between districts. *See Wescott v. Allstate Ins.*, 397 A.2d 156, 169 (Me. 1979) ("The maxim expressio unius est exclusio alterius [the expression of one thing is the exclusion of the other] is well recognized in Maine as in other states. It is a handy tool to be used at times in ascertaining the intention of the lawmaking body").

Moreover, the parties appear to have understood that the uniformity requirement would apply to them when they entered into the Agreement. Under Maine law:

> [T]he paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in the light of all of the circumstances under which it was made . . . Such intention must be gathered from the written instrument, construed in respect to the subject matter, the motive and purpose of making the agreement, and the object to be accomplished.

*Hodgkins v. New England Tel. Co.*, 82 F.3d 1226, 1230 (1st Cir. 1996). Here, Mr. Trefts, Chairman of the Board of Trustees of the District, stated that the District needed more information to establish "equitable rates." DSAMF ¶ 5; PRDSAMF ¶ 5. Greenville Steam's attorney also wanted to ensure that any change in rates would be

"consistently applied to other customers of the District" and added language to the Agreement to establish this principle.  DSAMF ¶ 10; PRDSAMF ¶ 10.  In addition, once Greenville Steam entered into the Agreement and connected the Plant to the System, it became a part of the District, as the District itself acknowledges, and therefore shares the same rights and obligations as other users.[62]  This includes the protections of section 1202's uniformity requirement.

Whether there was a breach of the Agreement, then, depends on whether the District's calculation of and failure to amend the rates charged to Greenville Steam (and then Gallop) violated section 1202's uniformity requirement.  Because there is a genuine dispute of material fact as to whether the rates satisfy section 1202, *see* discussion *infra* Section IV.B, the Court denies Gallop's motion for partial summary judgment as to Count I.

### 3.    Judicial Review of the Rates in the Agreement

---

[62]    The District states:

Contemporaneous with the Agreement, Greenville Steam installed a private sewer line running from a holding pit on the Plant property to the District's gravity-fed sewer line that carries wastewater to the treatment facility.  The Plant's private sewer not only comes within 200 feet of a District sewer, but actually ties to that sewer.  The Plant's buildings therefore became accessible within the meaning of the Sewer Use Ordinance. They remain accessible to this day.  So unlike the situation that existed prior to the Agreement, the Plant not only is within the District but also compelled to remain so under the Sewer Use Ordinance and 38 M.R.S. § 1160.
....
Neither the language of the Agreement nor the surrounding circumstances indicated that the Plant was to be treated any differently than other users of the System after it entered the District.  Indeed, an implied term of the Agreement is that the Plant would have the same rights and obligations possessed by all property owners in the District.

*Def.'s Opp'n* at 23-24 (internal citations omitted).

Before discussing the uniformity issue, the Court must address the District's argument that the rates established in the Agreement are not subject to judicial review. It is true that courts have held that where a sanitary district is under no obligation to furnish service outside its boundaries, the relationship between the district and subscribers outside its limits is purely contractual and the rates are not subject to judicial review. *Mun. Auth. of City of Monongahela v. Carroll Twp. Auth.*, 555 A.2d 264 (Pa. Commw. Ct. 1988); *Fairway*, 521 N.E.2d at 821; *Payson*, 581 P.2d at 1151 (citing *Kasun*, 97 P.2d 210); *City of Racine v. Town of Mount Pleasant*, 213 N.W.2d 60 (Wis. 1973); *Middlesex Cty. Sewerage Auth. v. Borough of Middlesex*, 181 A.2d 818 (N.J. Super. Ct. Law Div. 1962); *Schlarb*, 357 P.2d at 648. In other jurisdictions, courts have held that the rates imposed on both residents and non-residents, and in some cases even those established in contracts, are subject to judicial review for their reasonableness. *Platt*, 949 P.2d at 329; *Bobrowicz v. City of Chicago*, 522 N.E.2d 663, 668 (Ill. App. Ct. 1988); *Hansen v. City of San Buenaventura*, 729 P.2d 186 (Cal. 1986).

Either way, the Court does not need to resolve this issue here. As discussed above, the Court concluded that under the Act, the rates established in contracts with non-districts, such as the Agreement in this case, must comply with the provisions in the Act, including the uniformity requirement. *See* 38 M.R.S. § 1202. Therefore, the Court is merely determining whether the parties complied with the terms of the contract, subject to section 1202. The Court is not engaging in a general judicial review of the reasonableness of the rates. Moreover, the cases cited by the parties

deal with contracts entered into by a district with extra-territorial users, but, as already explained, after entering into the Agreement with the District and building the sewer line, the Plant became a part of the District and can no longer be considered an "extra-territorial user" or "non-resident." Thus, the circumstances of the contract here are not analogous to those in the cited cases.

### B.       Count II: Violation of 38 M.R.S. § 1202

Section 1202 reads in relevant part:

> Rates, tolls, rents and entrance charges shall be uniform within such district, whenever the cost to the district of installation and maintenance of sewers or their appurtenances and the cost of service is substantially uniform; but nothing shall preclude the district, from establishing a higher rate, toll, rent or entrance charge than the regular rates, tolls, rents and entrance charges in sections where, for any reason, the cost to the district of construction and maintenance, or the cost of service, exceeds the average, but such higher rates, tolls, rents and entrance charges shall be uniform throughout the sections where they apply.

38 M.R.S. § 1202.  Although the Maine Law Court has not construed section 1202, it has interpreted identical language governing water rates:

> Absolute uniformity in public service rates, like uniformity in taxation, is the unattainable.  It can only be approximated.

> Uniformity, as required by the act creating the district, therefore, must be held to mean that the rates established by the trustees must be reasonable and just, and without unjust discrimination between takers of the same class, having reference to the nature of the service and also the cost of supplying it.

*Kennebunk, Kennebunkport & Wells Water Dist. v. Inhabitants of Town of Wells*, 128 ME 256, 147 A. 188, 190 (Me. 1929) (citations omitted).

Other courts have further explained how to determine whether rates are "uniform," "reasonable," or "just." *See, e.g.*, *Concord Steam*, 519 A.2d at 270 (holding that substantial disparity between district's assumption of customer use of sewer system and customer's actual use was unreasonable); *N.E. v. A Piece of Land Fronting on W. Side of S. Lake St.*, 159 A.2d 528, 530 (Pa. Super. Ct. 1960) ("[C]harge that is made for the sewer service must be based upon actual user [sic], and must be reasonably proportional to the value of the service rendered and not in excess of it"); *Merrimac Paper Co. v. City of Lawrence*, No. CA 932197, 1995 WL 1286562, at *8 (Mass. Super. Ct. Aug. 29, 1995) (holding that customer rate will not be upheld in the absence of "a reasonable attempt to balance the myriad concerns and costs of sewage treatment and a rational effort to roughly estimate the benefit received"). *See generally* 12 E. McQuillin, THE LAW OF MUN. CORP. § 35:56 (3d ed. 2006); M. Brunner, Annotation, *Validity and Construction of Regulation by Municipal Corporation Fixing Sewer Use Rates*, 61 A.L.R.3d 1236, § 3(b) (1975).

The Court concludes that a factfinder could reasonably agree with the District that the rates charged to Greenville Steam, and then Gallop, satisfied the uniformity requirement. The caselaw makes clear that there are various ways to set sewer rates. *See Merrimac*, 1995 WL 1286562, at *5 (listing the different methods of rate-setting in the towns and cities throughout Massachusetts); *Glen Riddle Park, Inc. v. Middletown Twp.*, 314 A.2d 524, 527 (Pa. Commw. Ct. 1974) (upholding different rate structures for different classifications of users); *Antlers Hotel, Inc. v. Town of City of Newcastle*, 341 P.2d 951, 956 (Wyo. 1959) (upholding flat rate structure for some

users and flexible rate based on metered consumption for others).  Moreover, courts give considerable discretion to a municipality in setting its rates.  *See e.g.*, *Merrimac*, 1995 WL 1286562, at *8.

The District uses a flat-fee rate structure.  *Stip.* ¶ 8.  Its rate structure employs user units, which do not depend upon actual GPD discharges, but classifies properties by their use and the volume allocated to that type of use.  DSAMF ¶ 26.  The Plant is assigned 210 user units and charged a basic rate of $30,000 per year and penalties for flows in excess of 12,000 GPD.  *Stip.* ¶¶ 20, 21.

The District's expert opines that the rates charged to Gallop are uniform, and not unreasonable, arbitrary, or discriminatory based on several factors, such as the amount of capacity it allocated to the Plant (20,000 GPD), the Plant's peak discharges, the capacity remaining in the System for other users and future expansion, the quality of the Plant's discharges, and the Plant's status as the System's only industrial user.  DSAMF ¶¶ 30, 31.  Specifically, the District points to the fact that it is contractually bound to accept 20,000 GPD from the Plant.  *Stip.* ¶ 17.  It claims that it must therefore reserve 20,000 GPD of the System for the Plant and that this volume cannot be allocated to other customers.  DSAMF ¶¶ 33, 35.  It states that a single-family residence is assigned one user unit and the median 82 GPD discharged by a single-family residence equates to nearly 244 user units for the 20,000 GPD of capacity reserved for the Plant's use.  DSAMF ¶ 40.  It also states that the Plant's discharge lacks microbes, and therefore the discharge is nutrient deficient and can dilute and even kill the microbiology essential for the District's treatment

64

facility to operate properly.  DSAMF ¶ 60.  Additionally, it points out that the Plant's peak discharges exceed 12,000 GPD, and in some cases 20,000 GPD.  DSAMF ¶¶ 45, 46, 47, 49.  Given these facts, which the Court must accept as true for purposes of the resolution of the motion, the Court concludes that the District has generated a genuine dispute of material facts.

In sum, there is a genuine dispute of material fact as to whether the rate structure established for the Plant violated the uniformity requirement of section 1202.  The Court denies partial summary judgment on Count II.

### C.   Count III: Declaratory Judgment

#### 1.   Termination of the Agreement

Gallop seeks a declaratory judgment that the Agreement was terminated. Generally, courts will not interpret contracts as being of indefinite duration unless the agreement expressly states that is the intention of the parties.  *Roger Edwards LLC v. Fiddes & Son, Ltd.*, 245 F. Supp. 2d 251, 262 (D. Me. 2003); *Bangor and Aroostook Railroad Co. v. Daigle*, 607 A.2d 533, 535 (Me. 1992) (citing *William B. Tanner Co. v. Sparta-Tomah Broadcasting Co., Inc.*, 716 F.2d 1155, 1159 (7th Cir. 1983)).  Courts, while recognizing a right to terminate at will, have limited that right by requiring that a contract remain in effect for a reasonable period of time and reasonable notice be given.  *Daigle*, 607 A.2d at 535 (citing *Tanner*, 716 F.2d at 1159). Furthermore, the First Circuit instructed that:

> [T]he paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in the light of all of the circumstances under which it was made . . .  Such intention must be gathered from the written

instrument, construed in respect to the subject matter, the motive and purpose of making the agreement, and the object to be accomplished.

*Hodgkins*, 82 F.3d at 1230.

The parties disagree over whether the Agreement can be unilaterally terminated by Gallop.  Gallop points to the fact that the Agreement contains no express termination clause.  PSMF ¶ 15; DRPSMF ¶ 15.  Therefore, Gallop argues that under Maine law, the contract is terminable at will, provided reasonable notice is given.  Gallop sent a notice of termination on December 20, 2013.  *Stip.* ¶ 32.

In response, the District argues that the Agreement must be interpreted to give effect to the parties' intentions.  It points to the fact that Gallop installed a sewer line, connecting the Plant to the District, and agreed to comply with the ordinance, which legally obligates the Plant to remain connected as long as it is "accessible."

The Court has no quarrel with Gallop's contention that Maine law provides that a contract without term is terminable at will.  The question is whether the resolution of this issue requires fact-finding.  In other words, the issue narrows to whether the District has raised a genuine issue of material fact as to whether there is a termination point in the Agreement.  It may be that the contractual termination of accessibility is, as a practical matter, a contract without term.  However, in the Court's view, the practical meaning of this contract term must be bottomed on a finding of fact, namely whether once accessible, forever accessible, or whether there is a realistic termination point.  The Court is unable to assess whether the contract is for practical purposes without term, unless it engages in fact-finding.

Viewing these facts in the light most favorable to the District, the Court finds that a reasonable factfinder could agree that the intent of the parties was to enter into an Agreement not terminable at will, but terminable if the Plant were not "accessible" within the meaning of Article II of the District's Sewer Use Ordinance. Therefore, the Court denies partial summary judgment on this issue.

### 2.    Violation of 38 M.R.S. § 1202

Gallop seeks a declaratory judgment that the District violated 38 M.R.S. § 1202.  As discussed above, *supra* Section IV.B, the District raised a genuine dispute of material fact as to whether the District violated the uniformity requirement of section 1202.  The Court denies partial summary judgment on this issue.

### 3.    Liens of Certificates

Gallop seeks summary judgment on this Count for any Liens of Certificates filed by the District after the alleged date of termination of the Agreement.  However, as discussed above, *supra* Section IV.C.1, the District raised a genuine dispute of material fact as to whether the Agreement is terminable at will.  The Court denies partial summary judgment on this issue.

### D.    Affirmative Defenses: Waiver & Estoppel

The District raises the affirmative defenses of waiver and estoppel, claiming that Gallop is barred from making its claims.  Waiver is a "voluntary or intentional relinquishment of a known right and may be inferred from the acts of the waiving party." *Blue Star*, 2009 ME 101, ¶ 26, 980 A.2d 1270 (quoting *Interstate Indus. Unif. Rental Serv., Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 919 (Me. 1976)).  If a party in

knowing possession of a right acts inconsistently with the right or that party's intention to rely on it, the right is deemed waived.  *Id.*  "To bar enforcement of a known right, the waiver, however established, must have induced a belief in the party who is claiming reliance on that waiver that the waiving party intended voluntarily to relinquish his rights."  *Id.*

Equitable estoppel "precludes a party from asserting rights which might perhaps have otherwise existed . . . against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right."  *Id.* ¶ 27 (citing *Dep't of Health & Human Servs. v. Pelletier,* 2009 ME 11, ¶ 17, 964 A.2d 630 (quotation marks omitted)).  Equitable estoppel requires a misrepresentation that "may arise through a combination of misleading statements, conduct, or silence."  *Id.*

In order for the District to avoid summary judgment on the basis of its affirmative defenses of waiver and equitable estoppel, it must demonstrate that the summary judgment record contains disputed issues of facts to generate these defenses.  *See id.* ¶ 25.

Despite the factual disputes between the parties, the District has failed to allege facts that, even if true, would generate a successful defense based on either waiver or equitable estoppel.  The District alleges that because Greenville Steam freely entered into the Agreement (which Gallop willingly assumed) and performed its obligations for 23 years without protest, Gallop has waived its rights and is estopped from making its claims against the District.  However, these facts do not

indicate that Gallop has at any time acted inconsistently with its contractual rights to seek damages from the District resulting from a breach of the Agreement.  In fact, Gallop claims that it paid certain of the Certificates in order to avoid statutory foreclosure under 38 M.R.S. § 1208.  *Stip.* ¶ 36.  The doctrines of waiver and equitable estoppel do not provide defenses to the claims asserted by Gallop.

### E.      Counterclaim – Count I: Breach of Agreement

Gallop seeks summary judgment on the counterclaim to the extent that it claims Gallop has breached any obligation allegedly due under the Agreement after the date of the termination of the Agreement.  As discussed above, *see supra* Section IV.C.1, the Court finds that the District raised a genuine dispute of material fact as to whether Gallop could terminate the Agreement.   Therefore, the Court denies summary judgment on Count I of the counterclaim.

### F.      Counterclaim – Count II: Quantum Meruit

"Quantum meruit, also sometimes labelled 'contract implied in fact,' involves recovery for services or materials provided under an implied contract."  *Cashman*, 559 F. Supp. 2d at 104; *Hodgkins*, 83 F.3d at 1232.  A valid claim in quantum meruit requires: that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment.  *Cashman*, 559 F. Supp. 2d at 105. While the formalities of an express contract are not a prerequisite to recovery, there must be a reasonable expectation on the part of the claimant to receive compensation for his services and a concurrent intention of the other party to compensate him.  *Id.*

The Court finds that a factfinder could reasonably agree with the District that it is entitled to quantum meruit for the sewage services it provided to the District after December 20, 2013, the alleged date of termination.  Courts have held that a property is benefited by an adjacent sewer system, even when not connected.  *See, e.g.*, *Marnickas v. Tremont Mun. Auth.*, 445 A.2d 1383, 1385 (Pa. Commw. Ct. 1982) ("There is a rebuttable presumption that a property is benefitted by the construction of an adjacent sewer system"); *Kinkead v. Vill. of Round Lake*, 187 A.D.2d 905, 906 (N.Y. App. Div. 1992).  Although Gallop claims that it removed a portion of the pipeline and is disconnected from the System, PSMF ¶ 22, the District states that the District continues to reserve 20,000 GPD for the Plant's exclusive use, DSAMF ¶ 34, and remains ready and willing to accept wastewater from Gallop.  DSAMF ¶ 82.  Viewing the facts in a light most favorable to the District, the Court finds that the District has supplied enough facts to generate a genuine dispute as to whether there is a basis for recovery under quantum meruit.  Therefore, the Court denies summary judgment as the Count II of the counterclaim.

### G.    Counterclaim – Count III: Unjust Enrichment

Under Maine law, unjust enrichment describes "recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Cashman*, 559 F. Supp. 2d at 104-05; *Hodgkins*, 82 F.3d at 1232.  To establish a claim for unjust enrichment, three elements must be proved: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of

the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *Cashman*, 559 F. Supp. 2d at 105 (citing *Bowden v. Grindle*, 651 A.2d 347, 350-51 (Me. 1994)).

The Court concludes that if a factfinder decides that Gallop successfully terminated the Agreement as of December 20, 2013, the factfinder could reasonably agree that the District has established a claim of unjust enrichment for the sewage services it provided to the District after that date. Again, the District states that it continues to reserve 20,000 GPD for the Plant's exclusive use, DSAMF ¶ 34, and remains ready and willing to accept wastewater from Gallop. DSAMF ¶ 82. Therefore, the Court denies summary judgment as the Count III of the counterclaim.

## VI.   CONCLUSION

The Court DENIES the Plaintiff's Motion for Partial Summary Judgment (ECF No. 26).

SO ORDERED.

> /s/ John A. Woodcock, Jr.
> JOHN A. WOODCOCK, JR.
> UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2016